## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

| | | |
|---|---|---|
| ARK ENCOUNTER, LLC, CROSSWATER CANYON, INC., and ANSWERS IN GENESIS, INC., | } } } } | Case No. _____ |
| PLAINTIFFS, | } } } | <u>VERIFIED COMPLAINT</u> |
| vs. | } } | |
| BOB STEWART, individually, and in his official capacity as Secretary of the Kentucky Tourism, Arts and Heritage Cabinet, and STEVEN BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, | } } } } } } } | |
| DEFENDANTS. | } } | |

Plaintiffs Ark Encounter, LLC, Crosswater Canyon, Inc., and Answers in Genesis, Inc., come and aver the following:

### INTRODUCTION

1.      Defendant Kentucky state officials discriminated against Plaintiff organizations by wrongfully excluding them from participation in the Kentucky Tourism Development Program. Plaintiffs have been denied access to this tourism incentive program because of who they are, what they believe, and how they express their beliefs, in flagrant disregard of their constitutional and statutory rights.

2.      In this civil rights action, Plaintiffs, Ark Encounter, LLC, Crosswater Canyon, Inc. and Answers in Genesis, Inc., seek injunctive relief, declaratory relief, and damages, pursuant to 42 U.S.C. §§ 1983 and 1988, against Defendants Bob Stewart, individually and in his official

14670148.1

capacity as Secretary of the Kentucky Tourism, Arts, and Heritage Cabinet, and Steven Beshear, in his official capacity as Governor for the Commonwealth of Kentucky.

3.      This action is premised on the United States Constitution, Kentucky State Constitution, and on the Kentucky Religious Freedom Act, KRS 446.350, concerning the denial of Plaintiffs' fundamental rights of free speech, expressive association, due process, equal protection, freedom of religion, and freedom from hostility toward religion.

4.      Defendants' actions have deprived and will continue to deprive Plaintiffs of their paramount rights and guarantees provided under the United States Constitution and statutory law.

5.      Each and every act of Defendants alleged herein was committed by Defendants, and each and every one of them, under the color of state law.

## JURISDICTION AND VENUE

6.      This action raises federal questions under the United States Constitution, namely the First and Fourteenth Amendments, and under federal law, 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988.

7.      This Court has original jurisdiction over the federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

8.      This Court has supplemental jurisdiction over the state claims.

9.      This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343(3), the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and the requested relief regarding costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

10.     Venue is proper in the Eastern District of Kentucky, pursuant to 28 U.S.C. § 1391(b), because the claims arise in this district and the Defendants reside in this district.

2

## PLAINTIFFS

11.     Ark Encounter, LLC ("AE, LLC") is a limited liability company organized under the laws of the State of Missouri, and authorized to do business in the Commonwealth of Kentucky. Its purpose is to manage a multi-acre, paid-admission complex consisting of buildings, exhibits and other amenities in Williamstown, Grant County, Kentucky, centered on factually presenting the historical truth of Noah and the Ark, the Genesis Flood, and other historical accounts recorded in the Bible.  The sole member of Ark Encounter is Crosswater Canyon, Inc.

12.     Crosswater Canyon, Inc. ("Crosswater Canyon") is a 501(c)(3) religious non-profit corporation incorporated in the Commonwealth of Kentucky.  Its purpose is to support the ministry of Answers in Genesis, Inc., by operating museums, facilities, and exhibitions that provide religious, scientific, and educational instruction on the true history of origins.  Crosswater Canyon is a wholly owned subsidiary of Answers in Genesis, Inc.

13.     Answers in Genesis, Inc. ("AiG") is a 501(c)(3) religious non-profit corporation incorporated in the Commonwealth of Kentucky. Its principal office is located in Petersburg, Kentucky.  Its purpose is to provide seminars, lectures, debates, books, along with other forms of media, museums, facilities, and exhibitions that uphold the authority and inerrancy of the Bible as it relates to origins and history.

## DEFENDANTS

14.     Defendant Bob Stewart ("Secretary Stewart") is the Secretary of the Kentucky Tourism, Arts and Heritage Cabinet. In his official capacity, Secretary Stewart oversees all state agencies falling under the purview of this cabinet position, including the Department of Travel and Tourism.  As part of his duties, Secretary Stewart is responsible for providing recommendations of eligible tourism projects to the Kentucky Tourism Development Finance Authority for

3

preliminary and final approval of incentives, as provided under the Kentucky Tourism Development Act, KRS 148.850, *et. seq.*  Secretary Stewart is sued in his individual and official capacities.

15.     Defendant Steven Beshear ("Governor Beshear") is the Governor of the Commonwealth of Kentucky.  He is head of the executive branch of state government and is empowered to enforce all laws of the state, including the Kentucky Tourism and Development Act, KRS 148.850, *et.seq.*  As part of his duties, he selects and oversees Cabinet members, including the Secretary of Tourism, Arts, and Heritage Cabinet.  Governor Beshear is sued in his official capacity.

## FACTS

### Capturing a Vision for the Ark

16.     In 1994, AiG was formed in Northern Kentucky as a Christian non-profit ministry endeavoring to proclaim the absolute truth and authority of the Bible.

17.      AiG has no members, and its business and affairs are managed by a board of directors.  The President/CEO of AiG is Ken Ham.

18.     The stated mission of AiG "is to support the Church in fulfilling its commission; to bring reformation by restoring the foundations of the Christian faith which are contained in the book of Genesis; and to provide answers from Genesis and the rest of Scripture to make Jesus Christ, our Creator and Redeemer, relevant to the Church and world today."

19.     AiG adheres to a Statement of Faith, as set out in its bylaws, which includes the following principles:

- The scientific aspects of creation are important, but are secondary in importance to the proclamation of the Gospel of Jesus Christ as Sovereign, Creator, Redeemer, and Judge.

14670148.1

- The doctrines of Creator and Creation cannot ultimately be divorced from the Gospel of Jesus Christ.

- The 66 books of the Bible are the written Word of God. The Bible is divinely inspired and inerrant throughout. Its assertions are factually true in all the original autographs. It is the supreme authority in everything it teaches. Its authority is not limited to spiritual, religious or redemptive themes but includes its assertions in such fields as history and science.

- The final guide of the interpretation of Scripture is Scripture itself.

- The view, commonly used to evade the implications or the authority of Biblical teaching, that knowledge and/or truth may be divided into "secular" and "religious," is rejected.

- All things necessary for our salvation are expressly set down in Scripture.

- The account of origins presented in Genesis is a simple but factual presentation of actual events and therefore provides a reliable framework for scientific research into the question of the origin and history of life, mankind, the Earth and the universe.

- The great Flood of Genesis was an actual historic event, worldwide (global) in its extent and effect.

- The Noachian Flood was a significant geological event and much (but not all) fossiliferous sediment originated at that time.

- The "gap" theory has no basis in Scripture.

- All mankind are sinners, inherently from Adam and individually (by choice), and are therefore subject to God's wrath and condemnation.

- Freedom from the penalty and power of sin is available to man only through the sacrificial death and shed blood of Jesus Christ, and His complete and bodily Resurrection from the dead.

- Salvation is a gift received by faith alone in Christ alone and expressed in the individual's repentance, recognition of the death of Christ as full payment for sin, and acceptance of the risen Christ as Savior, Lord and God.

- Those who do not believe in Christ are subject to everlasting conscious punishment, but believers enjoy eternal life with God.

20.     The overarching vision of AiG is to be a catalyst for reformation by reclaiming the foundations of Christian faith which are found in the Bible, starting with "the very first verse" in the book of Genesis.

21.     From the outset of the ministry, AiG has sought to convey with creativity the relevance of Genesis and the rest of the Bible to the world.  Some of the early ideas expressed by AiG leadership included a Creation Museum demonstrating the biblical understanding of creation as well as a full-scale Ark showing how all the animal kinds could fit and exist on Noah's Ark per the description provided in Genesis.

22.     AiG is well-suited and qualified to build both the Creation Museum and a full-scale Ark attraction due to its mission about, interest in, and knowledge of, the authenticity and authority of the Bible, particularly, the book of Genesis.  From "the very first verse," Genesis contains an account of creation and, subsequently, an account of Noah, the Ark, and the Flood.

23.     At its meeting in October 2004, the AiG Board developed a strategic plan for the ministry, which included the building of a Creation Museum in 2007, as well as the building of a full-size replica of Noah's Ark, using biblical dimensions, sometime after 2007.

24.      Adopting this strategic plan, AiG leaders began to brainstorm about how the Ark would be presented and how the project could be financed.

25.     In February 2006, the AiG Board authorized AiG leaders to raise additional funds for ministry expansion, which contemplated future construction of the Noah's Ark structure.

26.     In May 2007, AiG opened its Creation Museum.  Through numerous and various exhibits referencing Scripture, the museum illustrates the truth of the creation account described in the Bible, concluding with a video that ties the truth of the creation with the truth of the claims of Christianity.

27.     The Creation Museum instantly became a popular attraction, drawing over 4,000 visitors on opening day, more than 404,000 in its first year of operation, and more than one million guests in its first three years of operation.  These numbers exceeded the feasibility study that was completed in early 2008 by America's Research Group (ARG), which had estimated 400,000 visitors in the first year of operation.

28.     Since its extraordinary beginning, the Creation Museum has continued to draw large crowds on a regular basis, and now averages 250,000-300,000 visitors per year.  The museum has attracted approximately 2.3 million visitors since its opening.

29.     Soon after the opening of the Creation Museum, encouraged by how well the museum was received by the general public, the AiG Board directed the organization's leadership to proceed with the Ark concept as a means of expanding the ministry's mission of proclaiming biblical authority and the Gospel of Jesus Christ.

30.     In October 2007, the AiG Board formally approved the Ark project and instructed ministry leadership to move forward with reviewing and refining its scope.

31.     Considering the biblical account of Noah's Ark and the Flood a unique and powerful reminder of God's judgment of sin and His wonderful gift of salvation, AiG leaders visualized an Ark attraction that would recreate this reminder of judgment and salvation.

32.     AiG leaders envisioned a replica of Noah's Ark made out of wood and set to full-scale dimensions − as specifically described in the book of Genesis − that would be a sign to the world that the Bible is true and that its message of salvation is to be heeded.  AiG leaders intended to prove, through the Ark attraction, the veracity of Noah's Ark and the Flood as recorded in the book of Genesis.

33.     AiG leaders believed an attraction centering on Noah's Ark – much like the Creation Museum − would be an evangelistic opportunity and outreach for its ministry, enabling AiG to teach the world about the Bible and the message of salvation in a creative and entertaining way.

34.     Just as Noah's Ark stood as a symbol of salvation, saving those who went through its door, AiG leaders intended their replica of the Ark to also symbolize eternal salvation through the metaphorical door of Jesus Christ.  The vision for the Ark, as developed by President/CEO Ken Ham, authorized by the AiG Board, and pursued by AiG leadership, contemplated a presentation of the Ark that would ultimately convey the Gospel message.

**Assessing Feasibility of the Ark**

35.     Upon receiving the charge from the AiG Board to proceed with the Ark project, AiG leadership began meeting regularly to develop ideas about a tourist attraction that would involve a full-size replica of Noah's Ark.  They assembled a team to design and build it, consisting of virtually the same team that designed and built the Creation Museum, as well as experts in the fields of biblical presentation, theme design, theme parks, construction, and operations.

36.     The plan from the beginning was to build a Noah's Ark to scale and of wood, lending credibility to the biblical description of the Ark and giving people insight into the immense size of Noah's Ark, vividly illustrating how Noah could fit all the representative land animal kinds on board.  The initial planning of the Ark also included a method of communicating a salvation message to attendees that analogized the door of the Ark with faith in Jesus Christ.

37.     The initial stages of necessary meetings included updates with key supporters, and visits with civil engineers to determine water and sewer support needs.

8

38.     Also required at the outset was a feasibility study, to determine whether the Ark attraction could draw an adequate audience.  Upon receiving authority from the Board, AiG leaders retained the services of America's Research Group (ARG), a highly reputable research firm, to assess anticipated consumer behavior concerning the Ark concept.  ARG had previously provided AiG a report on the receptivity of the Creation Museum, which accurately predicted first-year attendance.

39.     In April 2008, ARG provided AiG an extensive study demonstrating the far-reaching appeal for a replica of Noah's Ark as part of a tourist attraction.

40.     ARG conducted a formal nationwide survey derived from the general population of Americans without any regard to religious backgrounds or values, utilizing a statistically valid method.  From its survey, ARG was able to deduce the following:

- 7 in 10 thought about the size of Noah's Ark.

- 3 in 4 believed Noah's Ark was actually built.

- Over 3 in 5 said they would take their family to see a full-size replica of the Ark if it was located in America.

- 3 in 4 thought the idea of building an exact replica of Noah's Ark was a worthy idea that should be undertaken.

- 3 in 5 said a visit to the Ark would be a vacation idea for any time of the year.

- 3 in 10 could see themselves visiting the Ark as a multi-day visit.

- 1 in 2 could see themselves visiting the Ark as a single-day visit.

- 2 in 5 thought they and their families would visit the Ark multiple times.

- 4 in 5 would like to see the Ark built.

41.     In this same study, ARG determined the anticipated attendance to an Ark attraction during its first year would range from 1.2 to 2 million people, or an average of 1.6 million.

14670148.1

42.     The ARG study confirmed the Ark would be a worthy and self-sustaining endeavor that would allow AiG to communicate biblical truths to vast numbers of people.

43.     After receiving the ARG study, the AiG Ark project team began work on content and storylines, rough concept designs, and concept site plan development.

44.     As concepts for the Ark attraction began to take shape, the project followed a similar pattern as the Creation Museum, in that the plans were designed to demonstrate the truth of Scripture and point toward the claims of Christianity.

45.     Early concepts for the Ark attraction included a wide variety of exhibits located within or in close proximity to the Ark structure, including construction zone, queue line with tropical pre-flood garden, animal kinds exhibit, animal care exhibit, live animals, Noah's workshop, Door of the Ark exhibit, children's interactive exhibits, animal sounds interactive exhibits, family working scenes, Flood and Flood geology exhibits, Rainbow Covenant, and a "Christ the Door" Theater.

46.     As the plans developed in 2008 and into 2009, the scope of the project expanded to include various attractions in addition to the Ark itself, like a themed entry point for the park depicting the lifestyle of people in Noah's day, an extensive petting zoo and grazing area for animals, a children's play area, a replica of the Tower of Babel, an area that would provide a journey through biblical history from Noah to Moses, an area themed to look like a First Century village, a walk-through aviary, and a special events area.

47.     In June 2008, Ken Ham presented to the AiG Board an Ark Vision Statement, setting forth the reasons and motivations for pursuing the Ark project, drawing parallels between salvation offered by the Ark and that by faith in Jesus Christ, detailing:

1)     Noah's Ark was a sign to the world, before the Flood, that

    a)      God's Word is true and must be heeded,

    b)      man is a sinner,

    c)      God would judge sin with death,

    d)      God would judge man's rebellion with a global Flood, and

    e)      God provided an Ark of salvation for those who had faith in God; and

2)      Recreating the Ark today will be a sign to the present world that

    a)      God's Word is true and must be heeded,

    b)      all have sinned and suffer the penalty of death,

    c)      there is a coming final judgment – by fire, just as there was past judgment by a Flood,

    d)      Noah's Ark and the global Flood really happened in history, and

    e)      God has provided an Ark of salvation for us (as he did with Noah) – the Lord Jesus.

48.    At that juncture, in consideration of the ambitious plans, the anticipated costs for the initial construction of the Ark attraction grew to over $150 million.

49.    AiG leaders were confident some of the initial costs for the Ark itself could be raised from donations, but AiG leaders needed to devise a plan for the entire project to be fully funded.  Bond financing was considered at the time, but based on information received from a paid consultant, AiG determined that the entire Ark attraction could be financed by private investors.

50.    Due to the large nature of the project, AiG had already considered having a separate but wholly owned 501(c)(3) religious, non-profit subsidiary (Crosswater Canyon, Inc.) oversee and manage the Ark attraction.  But given the apparent need for private investors, AiG was also advised to form a for-profit limited liability company structure (Ark Encounter, LLC) for the project, so that Crosswater Canyon/AiG would manage the project and hold a substantial

(approximately 20%) ownership interest in the LLC, and a group of qualified (accredited) investors would hold the remaining (approximately 80%) ownership interest.

51.     AiG planned for Crosswater Canyon to serve as the managing member of the LLC. Under this structure, Crosswater/AiG would at all times retain specific management authority to supervise, manage and control the content, storyline and message presented in all exhibits and attractions throughout the project.

52.     As its project was underway, a CBS News survey in late 2009 revealed that most people believe the remains of Noah's Ark would be the greatest archaeological discovery of our time.  This news further confirmed that interest in Noah's Ark remains high and the timing of the AiG Ark project was ripe.

53.     Having reached a comfort level with the financial support and the timing of the project, AiG leaders pursued the Ark project in earnest.

**Finding a Home for the Ark**

54.     As an initial step, AiG had to decide where to build the Ark attraction.  The top priorities were to find a venue with: 1) affordable property; 2) of adequate size; 3) that offered economic incentives for the project.

55.     Northern Kentucky was a preferred option, not only because of its proximity to AiG and the Creation Museum, but also due to the availability of incentives for tourism attractions from the Commonwealth of Kentucky under the Kentucky Tourism Development Act ("KTD Act"), KRS 148.850, *et seq*.

56.     Recognizing that the general welfare and material well-being of the citizens of the Commonwealth depend in part on the development of tourism inside the Commonwealth, the

12

Kentucky Legislature passed the KTD Act in 1996, to provide incentives for the creation and expansion of tourism attractions to generate jobs and sources of revenue for the Commonwealth.

57.     This landmark legislation, the first of its kind in the nation, provides a state sales tax incentive program for tourism development projects.

58.     The KTD Act incentive for developers of approved new or expanding tourism projects is to recover up to 25% of a project's development costs, over the course of ten years, from the new state sales taxes generated by the project.

59.     According to KRS 148.853(2)(a), a tourism project will qualify for the incentives if: the total eligible costs of the project will exceed $1 million; the attraction will be open to the public at least 100 days; and the project will attract at least 25% of its visitors from non-residents of the Commonwealth.

60.     Applications for tourism incentives are submitted to the Secretary of Tourism, Arts and Heritage Cabinet for initial review.  Upon the Secretary deciding the project will likely meet the requirements of the KTD Act, the application is then forwarded to the Kentucky Tourism Development Finance Authority (KTDFA) with a recommendation of preliminary approval. The KTDFA is created within the Tourism, Arts and Heritage Cabinet, and consists of seven members appointed by the Governor.

61.     Should preliminary approval be granted, an independent consultant is selected by the Tourism, Arts and Heritage Cabinet – and paid by the applicant - to do an in-depth study on the proposed tourism project.

62.     The independent consultant confirms whether the tourism project will indeed: exceed $1 million in costs; be open to the public at least 100 days; attract at least 25% of its visitors

from non-residents of the Commonwealth; have a significant and positive impact on the Commonwealth; and not adversely affect existing employment in the Commonwealth.

63.     Based on the consultant's study, related materials, and a report from a requisite public hearing, the Secretary then determines whether to request final approval.

64.     Upon final approval, an agreement is signed between the state and the project developer allowing for the tourism incentives.

65.     Since its passage, the KTD Act has helped secure for Kentucky more than $1 billion in new tourism investments and attractions. A wide variety of projects, with various missions, goals, and presentations, has benefitted from the legislation and qualified for tourism incentives, including, but not limited to, the Newport Aquarium, 21c Museum Hotel, Kentucky Speedway, Kentucky Kingdom theme park, and numerous bourbon visitor centers, like the Buffalo Trace distillery, Marker's Mark distillery, Old Forester distillery, and Rare Breed Distilling.

66.     Because AiG knew the scope of its project would meet the objective eligibility requirements of the KTD Act, AiG anticipated it would receive the state tourism incentives should it decide to build the Ark attraction in Kentucky.

67.     In October 2009, AiG requested a meeting with state officials to confirm AiG's expectations.  AiG representatives met at the Creation Museum with Todd Cassidy ("Cassidy") and Bill Dexter ("Dexter"), officials with the Kentucky Department of Travel and Tourism, to discuss the prospect of receiving said tourism incentives from the Commonwealth, as provided in the KTD Act.

68.     AiG was forthright with the Kentucky officials about the religious nature and biblical theme of the anticipated Ark project.  The officials were given a full tour of the Creation

14

Museum so they could get a sense of how the Ark attraction would be presented to the general public.

69.     After the tour, Cassidy spoke favorably of the anticipated project, but advised that he and Dexter had some concerns about "separation of church and state" issues due to the "faith-based" nature of the Ark project.

70.     When told of Cassidy and Dexter's concern, AiG leaders determined it may be wise to investigate other potential locations for the Ark attraction outside Kentucky.

71.     AiG hired a real estate firm from Cincinnati, Ohio, to search for available properties that would be at least 300 acres in size in the states of Kentucky, Ohio, and Indiana.

72.     The real estate firm contacted various state and economic development officials in those three states to determine viable property options for the Ark project.

73.     In December 2009, to help facilitate discussions with state and economic development officials about finding a location for the Ark attraction, AiG leaders retained Jerry Henry and Associates ("JHA") to prepare an economic impact study to show what benefits the Ark attraction would bring to its chosen venue.

74.     For comparison purposes, this JHA study encompassed a direct visitor study of the Creation Museum, which confirmed the overwhelming positive impact the museum has had on the Northern Kentucky and Cincinnati, Ohio areas.  That aspect of the study demonstrated that the average Creation Museum visitor is a highly desirable traveler for the regional tourism industry, deducing that:

- The average Creation Museum visitor lived 259 miles from the museum.

- 2/3 of the Creation Museum's visitors had a college or advanced degree.

- The average Creation Museum visitor had a household income of $67,500.

15

- The average guest has visited the museum 1.7 times.

- The average length of stay at the Creation Museum was nearly 6 hours.

- 2/3 of the Creation Museum visitors said they were likely/very likely to return within 12 months, with nearly 90% saying they would return within 3 years.

- Slightly over half of the Creation Museum visitors spent the night in the area, with an average overnight stay of 1.8 nights, and 86% of those overnight stays took place at area hotels/motels.

- The average travel party was estimated at 3.69 members.

75.     Utilizing actual attendance numbers at the Creation Museum, which showed an average of 350,000 visitors per year in the first two years of operation, the JHA study calculated the number of days and overnight stays for visitors, and estimated direct tourism and travel expenditures at $41.4 million. Nearly 80% of that, or $32.7 million, was spent at businesses in the region unrelated to the Creation Museum. The study also calculated that an estimated 2,391 new jobs were created in the area due to the Creation Museum.

76.     Borrowing from the marketing study conducted by ARG, the JHA economic impact study presumed an expected first-year attendance of 1.6 million visitors for the Ark attraction. Noting the Ark attraction would have a profile similar to the Creation Museum, but pull from an even larger segment of the population, JHA predicted an extraordinary economic boost for whatever geographic area the Ark selected.  With a reasonable degree of certainty, JHA was able to predict:

- 65% of the Ark visitors would spend at least two nights in the region.

- Assuming the same percentage use of hotels and group size as the Creation Museum, an expected 479,132 hotel room nights would be sold.

- An annual number of "visitor days" would be approximately 2,640,000, based on the first 12 months of operation (combination of overnight stay and day visitors)

- Per person, the expected spending (including day-trippers as well as overnight stays) would amount to $107.40.

- The direct spending per visitor, combining expenditures at the Ark attraction and those within the market, would be $151.98, which would amount to $243,168,000.00 in direct spending impact for the first year of operation.

- Including the industrial output, the total economic impact of direct spending for first year of operation was projected to be $359,888,640.00.

- Adding the capital expenditures, the total economic impact for first year would be $591,088,640.00.

- An anticipated 14,038 new jobs would be created in the area during the attraction's first year of operation.

77. Sharing its economic impact study, AiG leaders and their real estate firm engaged in various discussions with representatives from Kentucky, Indiana, and Ohio, to find suitable property for the Ark project.

78. Representatives from Indiana actively pursued the Ark project, proposing some attractive land in the City of Greensburg.

79. At the same time, AiG leaders continued discussions with Kentucky officials about the availability of KTD Act tourism incentives. During those discussions, state officials indicated the religious nature of the project would not be a barrier for receiving the Act incentives.

80. Encouraged by that initial feedback, AiG leaders determined that large tracts of land located in Williamstown, Grant County, Kentucky were the likely best overall option for the Ark attraction.

81. AiG leaders began to focus on available land in Grant County, seeking to obtain contracts or purchase options for the most suitable properties, while keeping in mind AiG's other land options in other states, such as the Indiana property.

17

82. On April 20, 2010, an AiG real estate agent entered into a contract for an option to purchase over 500 acres of land in Grant County, Kentucky, on behalf of AiG and the entity that would later be formed as AE, LLC. AiG leaders wanted an option contract so as not to impact their eligibility under the KTD Act, and because they did not wish to be obligated to purchase the property at that time, just in case the tourism incentives would not be allowed in Kentucky, or if they discovered some other property that was better suited for the project.

**Moving Forward with Building the Ark in Kentucky**

83. At its meeting in May 2010, the AiG Board resolved to form a wholly owned 501(c)(3) subsidiary (Crosswater Canyon) as well as a separate limited liability company (AE, LLC) for the purposes of structuring ministry ownership and management of the Ark project. With this anticipated arrangement, AiG would maintain primary ownership and oversight/direction for the Ark project.

84. On July 14, 2010, AiG leaders met with Kentucky officials in Frankfort, Kentucky to discuss the prospect of locating the Ark attraction in Williamstown, Grant County, Kentucky.

85. At said meeting, AiG counsel referenced the ARG and JHA studies, and engaged in significant discussion with Commonwealth officials about the economic benefits of the Ark project in Kentucky.

86. AiG counsel also provided a legal memorandum to Kentucky officials addressing the so-called "separation of church and state" issue in an effort to allay any legal concerns regarding the Establishment Clause of U.S. Constitution and/or Section 5 of the Kentucky State Constitution.

87. Describing the Ark project as a "religious-themed park in Kentucky with a full-scale Noah's Ark being the major attraction," the legal memorandum cited relevant authorities in

support of the constitutionality of the plan and incentives received, showing that religious organizations can properly receive facially-neutral economic development incentives in the same manner as any other applicant without violating the federal or state constitutions.

88.     Kentucky officials indicated that they received the presentation favorably. The Cabinet's counsel, Dexter, expressed at the meeting that the Commonwealth did not mean to imply that they had a concern about the constitutionality of the incentives available for the Ark project.

89.     Though AiG leaders were still considering a location in Indiana and other spots for the Ark attraction at the time, they were encouraged by the July 2010 meeting and the positive feedback from the Kentucky officials. Provided they could indeed obtain clearance on the incentives from Kentucky officials, AiG leaders favored the idea of building the Ark attraction in Grant County, Kentucky.

90.     After the meeting, on this same day of July 14, 2010, AiG counsel inquired about obtaining an application for the economic incentives so that AiG could move toward building the Ark project in Grant County, Kentucky. The next day, July 15, 2010, Cassidy provided an application for the incentives, but cautioned that their counsel, Dexter, had not yet had an opportunity to review AiG's legal memorandum.

91.     This statement gave AiG leaders some pause, but they remained optimistic the tourism incentives would be available once Kentucky officials considered the law on point.

92.     AiG leaders and legal counsel followed up on the July 2010 meeting, initiating several subsequent phone conversations with Kentucky officials about the Ark project. During these conversations, Kentucky officials indicated they were still considering the legal ramifications of the Ark project, but suggested that incentives should be available under the KTD Act.

93.     While awaiting final word from Kentucky officials, AiG leaders continued to evaluate land options in different locales.

94.     On August 26, 2010, AiG worked through its real estate agent to complete a contract on another option to purchase land in Grant County, adjacent to the property subject to the previous option to purchase.  This second option involved only 1.86 acres.

95.     On September 8, 2010, the AiG Board approved "The Ark Encounter" as the official name for the Ark project.

96.     During its October 2010 meeting, the AiG Board appointed board members for the wholly owned 501(c)(3) subsidiary, Crosswater Canyon, that was directed to serve as the managing member of AE, LLC—the entity overseeing the Ark project.

97.     On October 14, 2010, AiG leaders met with local officials in Grant County, Kentucky, to discuss the possibility of the Ark project.  During this meeting, AiG leaders showed how impactful the Ark attraction could be for the local economy. The presentation was warmly received and local officials encouraged AiG leaders to bring the Ark attraction to their area, indicating they would provide additional local incentives, aid in securing zoning changes, and needed public services for the Ark attraction.

98.     After that meeting with local officials, on that same date of October 14, 2010,  AiG counsel spoke with Cassidy about the project. Counsel conveyed the enthusiastic support AiG received from Williamstown and Grant County officials. During the conversation, Cassidy indicated that Kentucky officials would like to meet with AiG leaders the following week to discuss the Ark project further.

99.     On the following day, October 15, 2010, AiG counsel emailed Cassidy confirming the meeting and inquiring as to whether Kentucky officials had any lingering concerns about the

project being eligible for tourism incentives.  Cassidy emailed back that day, advising the project was moving in the right direction and they only had a few details to discuss.

100.    On October 22, 2010, AiG leaders and counsel met with Kentucky officials about the status of the Ark project.  At this meeting, Kentucky officials confirmed that their legal concerns had been fully addressed and they assured AiG leaders the project would qualify for incentives under the Act.

101.    Following that meeting, on October 28, 2010, AiG leaders and counsel met with Governor Beshear regarding the Ark project.  The Governor voiced his full encouragement and promised to publicly support AiG's application for the tourism incentives.

102.    In light of the assurance AiG leaders received from Kentucky officials and the Governor about the incentives, AiG decided to focus almost entirely on the venue option in Grant County, Kentucky.

103.    On November 15, 2010, AE, LLC submitted an application for economic tourism incentives under the KTD Act.

104.    For purposes of the application, AE, LLC provided all requisite information, including ownership information that projected AiG owning 20% of the LLC through its wholly-owned 501(c)(3) subsidiary, Crosswater Canyon.  AiG provided financial statements as the owner. AiG also supplied business and marketing plans for the project known as The Ark Encounter.

105.    The application described the project as follows:  "The Ark Encounter will be a 160 acre complex of associated historical displays, museums, theaters, amenities, food and beverage, retail and event venues and parking.  Its main attraction will be a full-scale replica of Noah's Ark. The Ark Encounter will include a large animal show and exhibit area, as well as large interactive children's area."

21

106.    Though the preliminary approval was not yet formally granted, Kentucky officials enthusiastically accepted the application for the Ark project.

107.    Due to the excitement generated by the project, the Governor, Commonwealth officials, county and city officials, and AiG leaders decided to schedule a joint press conference announcing the Ark project was coming to Williamstown, Grant County, Kentucky.

108.    On November 19, 2010, representatives for AiG and AE, LLC entered into a Memorandum of Agreement (MOA) with Williamstown and Grant County regarding the Ark project.

109.    Confident the Ark project would go forward in Grant County, Kentucky, on November 29, 2010, AE, LLC worked through its real estate agent to complete a contract on another option to purchase an additional 8.48 acres in Grant County.

110.    On December 1, 2010, AiG held a joint press conference with Governor Beshear in the State Capitol to publicly announce the Ark project as an exciting new and major tourist attraction for the Commonwealth of Kentucky.

111.    In the press release leading up to the press conference, Governor Beshear touted the anticipated construction of a full-scale Noah's Ark tourist attraction in Northern Kentucky, stating:  "We're excited to join with the Ark Encounter group as it seeks to provide this unique, family-friendly tourist attraction to the Commonwealth."

112.    At the press conference, AiG representatives confirmed the religious aspect of the project, describing the project as an opportunity to present biblical information to people about a subject that interests many. AiG representatives stated they wanted the attraction to lend credence to the biblical account of the Flood and Noah's Ark. They also confirmed the presentation at the attraction would encompass a Gospel message.

113.     Emphasizing the expected economic boost and jobs the Ark project would generate, Governor Beshear stated that he favored the project receiving tourism incentives.  At the public event, recorded by numerous television cameras, the Governor rebuffed any legal concerns about the Ark project, remarking the arrangement posed no constitutional issues.

114.     Consistent with what Kentucky officials had told AiG representatives privately, Governor Beshear announced to the press: "I think it's fair to say we are all very positive, initially, about this application, and we don't really see any problems in getting it approved."

115.     In conjunction with the press conference, AiG updated its website to include the vision for the Ark project showing the intertwining relationship between the historicity of the Ark and the Gospel message.

**Obtaining Official Approval of Incentives for Building the Ark in Kentucky**

116.     A few weeks later, on December 20, 2010, the KTDFA provided preliminary approval of the application for tourism incentives.

117.     On this same day, December 20, 2010, KTDFA and AE, LLC entered into a MOA, reflecting the intention of building the Ark attraction in Kentucky and the provision of incentives subject to satisfaction of the requirements of the KTD Act.

118.     AE, LLC was required by KTDFA to agree to a provision in the MOA providing that AE, LLC would not discriminate on the basis of religion in hiring workers for the Ark project.

119.     This provision was a novel request, not a requirement of the KDA Act, not part of the standard MOA form used for KDA Act incentives, and not a provision that had been required of any other applicant that sought incentives under the KDA Act. AiG was reluctant, but nevertheless, initially agreed to AE, LLC complying with this provision because AiG anticipated a variety of private investors − in addition to Crosswater Canyon − having ownership of the LLC.

23

120.     The hiring restriction was disconcerting to AiG leaders, who believed it was critical for their ministry and purpose to maintain their identity and mission in the Ark project through their management and key positions.  They did not necessarily want to limit employees to Christians only, but they did want to limit hiring of certain management positions to individuals who shared their religious beliefs.

121.     Despite their concerns about the prohibition on religious hiring, AiG leaders reluctantly conceded on this point because of their decision to utilize and involve a variety of private investors. Due to the anticipated substantial private (non-religious) ownership in the project, AE, LLC determined it may not be allowed the exemption available under federal and state law to utilize a religious preference in hiring.  Still, AiG leaders planned for AE, LLC, with Crosswater Canyon having a substantial interest and holding the position of managing member, to develop hiring policies that would require employees to maintain high moral standards and agree not to oppose certain beliefs about the authenticity of biblical accounts, regardless of their religious affiliation.  Moreover, Crosswater/AiG would further take the precaution of retaining full authority to supervise and manage the all content, storyline and message presented in all the exhibits and attractions throughout the project, and all employees would be required to honor the purpose and mission of the company through their conduct and work performance.

122.     The December 2010 MOA also included the statutory requirement that AE, LLC cooperate in, and pay the cost of, an independent consultant's report.

123.     Per the MOA and the KTD Act, AiG leaders and representatives cooperated with Hunden Strategic Partners ("Hunden"), the independent consultant retained to conduct the analysis to determine whether the Ark project could be expected to produce the economic and fiscal impact

needed to qualify for incentives under the KTD Act.  AiG provided the requested information and answered Hunden's questions about the project.

124.    On May 6, 2011, Hunden submitted a report to Commonwealth officials concluding that the Ark project met all the objective criteria set out in the KTD Act as proscribed in the Act.

125.    On May 19, 2011, the KTDFA, having considered the Hunden report and recommendation of the Secretary, met and gave final approval for incentives on the Ark Project per the KTD Act.

126.    Thereafter, the KTDFA and AE, LLC entered into a Tourism Development Agreement ("TDA").  Starting with a form agreement, the parties discussed and made several changes to reflect the MOA and to address particular details unique to the arrangement.

127.    As with the MOA, the TDA states: "The Company will not discriminate on the basis of religion when hiring employees for the Project." AiG leaders maintained the same reservations about this provision, but they thought the language was obligatory because it was inserted in the MOA.  AiG leaders still anticipated hiring for the project that would be premised on moral standards and understanding of biblical historical accounts.

128.    In the TDA, AE, LLC affirmed: "Absent the assistance provided to the Company by KTDFA through the Inducements, the Company would not engage in the Project."  This provision reflected the reality that AE, LLC would not have pursued the project in Kentucky "but for" the incentives provided by the Commonwealth.

129.    Under the terms of the KDA Act and the TDA, the Ark project was eligible to receive incentives of up to 25% of approved costs incurred through May 19, 2014.

**Initial Funding Delays and Timing of Construction of Ark**

130.    Following the final approval of the tourism incentives, AiG leaders proceeded with the Ark project.

131.    Options to purchase the tracts of land were exercised, with closings on the property taking place on July 22, 2011, and September 20, 2011.

132.    AiG leaders continued to develop and refine the plans and details for the Ark attraction as they looked forward to financing the project.

133.    AiG leaders prepared offerings for private investments in AE, LLC, in an effort to raise $125 million, providing for a minimum investment of $100,000 per investor.  In conjunction with these offerings, AiG supplied would-be investors with private placement information.  The information included up-to-date descriptions of the plans, depicting the effort as an extraordinary evangelistic opportunity to construct a unique facility, presenting a full-size biblical Ark and historical background, and through it, to show the world the Bible is true.

134.    AiG did not take money from subscribers but structured the offering so that investment monies would be called once AiG reached a certain threshold amount of subscriptions.

135.    The initial feedback, impacted by market restrictions and a difficult economic environment, resulted in the subscription process taking longer than anticipated.  As a result, AiG leaders decided to alter the offering from $125 million to $67 million, to focus on funding for phase one of the park, reflecting a change to proceed with a phased development plan.

136.    The adoption and pending implementation of the federal Affordable Care Act ("Obamacare") also had a significant impact on the financial and structural plans of the AE, LLC project. It became apparent to AiG that a project funded by private investors would likely become subject to the legislation's mandate coverage of abortion-inducing drugs (abortifacients), and this

26

would be a violation of the religious and moral beliefs of the ministry regarding the sanctity of human life. AiG considered that it may be possible to avoid this conflict with the legislative mandate if it switched to debt financing for the project and maintained 100% ownership of AE, LLC, through its religious non-profit subsidiary, Crosswater Canyon.

137.   In light of these developments, starting in 2012, the AiG Board considered whether the best course would be to discontinue private investment and instead issue bonds for the Ark project.

138.   As AiG continued to seek funding for the Ark project, it was continually being refined.  The plans began to crystalize in more specific detail concerning how the Ark would be used to present biblical truths, anticipating 132 bays of exhibits and two 60-seat theaters, including the "Christ the Door" theater.

139.   AiG leaders had continuing discussions with Commonwealth officials in 2012 about the status of the Ark project, explaining the decision to proceed in phases for construction of the project.

140.   At its January 2013 meeting, the AiG Board decided to switch from a private investment model to taxable bonds as the financial structure for the Ark project, with Crosswater Canyon being the sole owner of AE, LLC.

141.   Thereafter, AiG switched from the private investment efforts and pursued financing for the Ark project through bonds to be issued on behalf of Crosswater Canyon, which remained a solely owned and controlled subsidiary of AiG.

142.   Later in 2013, AiG leaders were able to forecast that the switch to bonds would be successful in supplying sufficient financing for the Ark project.  They were anxious to move forward with construction, but had some concern about whether the delay in construction might

affect the previously approved tourism incentives.  They knew they had only a 3-year window to expend the construction costs that would be used to calculate the incentives provided under the KTD Act.

143.    AiG leaders did not know if they could amend their application for tourism incentives that had already been approved, or if a new application would be required.

**Reaffirming Vision for the Ark and Renewing Application for Tourism Incentives**

144.    AiG closed on the bond issue in December 2013, with a second delivery of bonds (another tranche of bonds) in February 2014. These events confirmed that adequate financing was in place for the Ark project, particularly, for phase one of the project relating to the Ark itself.

145.    During its meeting on February 27, 2014, the AiG Board was given a report on the Ark project, and was informed that enough money had been raised to allow the release of funds to start construction of the Ark project.  The Board determined to go forward with the Ark project with a renewed vigor, understanding that AiG would effectively own and maintain the Ark attraction, given that Crosswater Canyon was the sole member of AE, LLC, and Crosswater Canyon was wholly owned by AiG.

146.    Subsequently, on this same day of February 27, 2014, Ken Ham provided an online press conference to update the status of the Ark project.   During this conference, he confirmed the evangelistic nature and ministry of AiG, and highlighted evangelistic aspects of the Ark project. With great enthusiasm, Mr. Ham announced that financing was in place to move forward with the construction of phase one of the Ark attraction in Williamstown, Grant County, Kentucky.

147.    The AiG Board resumed with its meeting on the following day, February 28, 2014. During this portion of the meeting, the Board discussed AiG going forward with an updated application for tourism incentives with the Commonwealth of Kentucky.

14670148.1

148.    The AiG Board also considered on this day how Ark Encounter employees would be hired now that it was fully controlled by AiG, a Christian ministry. As previously envisioned, they wished to maintain a strict code of moral conduct for all Ark Encounter employees, but considered the possibility of hiring individuals from the surrounding area who are not necessarily Christian. The Board discussed the need and desire to ensure that management and key positions at the Ark project share their Christian faith in order to maintain the identity and integrity of the project. Given the change in structure, AiG Board knew that the project now had the legal right to avail itself of the federal and state statutory provisions that allow a religious preference in hiring.

149.    On March 13, 2014, AiG leaders met with Kentucky officials about the status of the current application. Despite having the requisite financing in place, AiG leaders knew that they would not be able to meet the capital investment requirement to have the project completed by May 2014. Cassidy advised that a new application would be required to receive the tourism incentives anyway because of the change in the scope of the project, and that the current application would need to be withdrawn in order to submit a new one.

150.    On March 28, 2014, John Pence, on behalf of AE, LLC, submitted a notice of withdrawal of the original application for tourism incentives to the KTDFA.

151.    On this same date, March 28, 2014, as instructed by Cassidy, AE, LLC submitted a second application for incentives to the Commonwealth of Kentucky.

152.    The second application was very similar to the first, except that it specified the project would now be built in phases, rather than all at once. The nature of the Ark project remained unchanged.

153.    Although AiG leaders had all of the necessary financing in place for the initial construction of phase one, AiG relied upon the receipt of the incentives to supply critical cash flow

for debt retirement and for planning the extent and timeframes of the additional (future) phases of the project.

154.    Fully expecting approval of the second application for tourism incentives, AiG, Crosswater Canyon, and AE, LLC proceeded with permit applications for construction to begin the project as soon as practicable.

**Resistance and Eventual Denial by Kentucky Officials**

155.    On April 24, 2014, AE, LLC received a letter from the Cabinet's counsel, Dexter, expressing concerns about the second application. In particular, Dexter mentioned having reviewed Ham's online press conference in February, and made much of Ham's comments about the evangelical mission of AiG and the Ark project and his reference to an exhibit, "Christ the Door" theater.

156.    In this letter, Dexter opined:  "Providing tax incentives that would further any such overt evangelism amounts to impermissible state funding of religious indoctrination."  Dexter added that allowing the tax rebate incentives for a religious organization – even though it would be though application of a facially-neutral law – could improperly advance religion.

157.    Based on the statements he gleaned from the online press conference, Dexter further opined that "the Project changed from a tourism attraction to an extension of AiG's ministry."

158.    Dexter ended his letter by requesting additional information to assure that the use of tourism incentives would be in compliance with constitutional standards.

159.    AiG leaders were confused and disappointed by this response.  The Ark project had always been presented as an extension of the AiG ministry. Although details about the specific design of the Ark and its particular exhibits were refined over time, the project always retained an evangelistic overtone.  The Dexter objection seemed disingenuous and inaccurate. AiG leaders

further disagreed with Dexter's claim that the use of evangelistic messages at the Ark theme park would somehow result in unlawful "religious indoctrination."

160.    In an effort to provide the requested information and correct erroneous notions about the Ark project, on May 5, 2014, AiG general counsel John Pence wrote Dexter explaining that the theme park was open to everyone, regardless of religious affiliation, and would attract the attention of individuals holding various points of view about Noah's Ark and Christianity.  This letter also confirmed that no religious indoctrination would take place in the park, as no one would be forced to accept any views and interpretations presented in the park.  The letter further pointed out that nothing other than the phases of construction had materially changed in the Ark project from the original application that had been previously approved.

161.    On May 13, 2014, Dexter emailed AiG counsel, confirming receipt of the May 5, 2014 letter.  He indicated that the letter resolved some of the state's concerns but additional clarification was needed.  He relayed his thoughts on how the issue could be resolved:  "The issue is whether we can reach an understanding that there can be no religious indoctrination as part of the project.  If we can reach an understanding and the Authority approves incentives for the project, those details will be included as covenants in the Tourism Development Agreement that follows final approval."

162.    Hoping to reach a resolution, AiG counsel wrote back to inquire as to what else would be needed to aid Kentucky officials in their review, and to stress that the Ark project had not been designed to promote religious indoctrination.

163.    Also, a few days later, on May 22, 2014, to address the constitutional concerns set out in Dexter's April 24 letter, AiG counsel submitted correspondence supplying a thorough and in-depth legal analysis confirming the propriety of the proposed tourism incentives, showing how

31

application of the incentives to the Ark project would fully comply with the U.S. Constitution and the Kentucky Constitution, and how, contrary to what had been suggested by Dexter, the *refusal* to allow a religious organization to participate in the facially-neutral tax incentive program would be a violation of both the federal and state constitutions.

164.    Shortly after receiving the letter dated May 22, 2014, Dexter contacted AiG counsel to indicate that preliminary approval of the second application could be forthcoming, but Kentucky officials had lingering concerns about religious indoctrination and wanted AiG to assure that there would be no "proselytizing" in the theme park.

165.    The newly stated concern about "proselytizing" represented yet another disturbing development. Because the term is not subject to any distinct meaning and one can express religious beliefs without engaging in religious indoctrination, AiG leaders believed the insertion of the term in the agreement would cause significant confusion. In reply to Dexter, AiG counsel left him a voice mail to explain how and why AiG could not agree to a vague ban on "proselytizing."

166.    But, then, inexplicably, on June 9, 2014, Dexter sent a letter to AiG counsel, stating that AiG had assured Kentucky officials no visitor at the Ark attraction "will be subject to religious proselytizing or be forced to accept a certain view or interpretation of Scripture, nor will the project function as a church or a place designated for religious worship." Holding the incentives over AiG's head, Dexter offered, based on these supposed "assurances," that the Secretary was prepared to recommend preliminary approval of the tourism incentives. Dexter concluded his letter by noting the Cabinet would require a document in which AE, LLC must agree to not make hiring decisions on the basis of religion.

167.    AiG leaders were troubled by Dexter's June 9 letter because it misrepresented the statements of AiG counsel, insisted on a ban on "proselytizing," added a prohibition on "religious

32

worship," and sought to require their religious organization to abandon its legal right to utilize a religious preference in its hiring decisions. None of these new requirements or restrictions had previously been imposed upon any other applicants for, and/or recipients of, incentives under the TDF Act.

168.     In light of these pressing concerns, on June 13, 2014, AiG counsel sent another letter to Dexter, addressing the matters set out in the June 9 letter. The June 13 letter explained the difficulty with the suggested ban on "proselytizing," emphasized that the Ark attraction will welcome all points of view, and advised that a ban on religious proselytizing would be unlawful, as well as impossible to enforce. In addressing the prohibition on "religious worship," AiG counsel assured that no space would be set aside in the park for corporate worship, but reminded Cabinet officials of the religious nature of the controlling organizations, the possibility of visitors using various spaces for prayer and other religious purposes, and noting how they could not rightly discourage those kinds of activities. Counsel further noted the need and legality of a religious organization to maintain its religious identity through its appropriate hiring practices and preferences.

169.     On June 24, 2014, Secretary Stewart wrote AiG counsel about the pending application, but ignored the existence of the June 13 letter. Incredibly, the Secretary stated that he was prepared to recommend AE, LLC's application for preliminary approval at the upcoming KTDFA meeting on the terms set out in Dexter's letter of June 9. The Secretary threatened that a refusal to comply with the terms of the June 9 letter would result in the Secretary withdrawing the application for consideration.

170.     After receiving this letter, and on this same day of June 24, 2014, AiG counsel reached out to Dexter and asked if Commonwealth officials would be willing to meet and discuss

33

the outstanding issues regarding the second application.  AiG leaders were earnestly seeking an amicable resolution of the matter, without having to resort to litigation.  Dexter spoke with Secretary Stewart and advised that they would be willing to meet and discuss the matter.

171.   The scheduled meeting took place on July 9, 2014, and included AiG leaders and counsel and Commonwealth officials.

172.   During this meeting, the Secretary reiterated his concerns about the evangelistic aspect of the Ark project, but he seemed to accept the assurances and clarifications supplied about the Ark project.

173.   During the July 9, 2014, meeting, AiG leaders and counsel explained the modification in the corporate structure for the Ark project since the first application and the necessity of the modification, noting that as a religious organization it could clearly avail itself of the law allowing for religious preferences in hiring.  AiG representatives stated that they could not agree to a provision prohibiting religious preferences in hiring, but because they felt comfortable with the legality of their position, they could agree to a blanket provision affirming that they would at all times certainly comply with all applicable federal and state laws relating to hiring, and otherwise.

174.   AiG representatives further discussed at the meeting their concerns about a ban on "proselytizing" and why they could not agree to such a provision.  Commonwealth officials indicated that they understood those concerns and would rely on the assurances noted in the May 5, 2014, letter from AiG general counsel John Pence, in which he affirmed that no visitor would ever be forced to accept the views and interpretations presented in the park. Based on the comments in the meeting, AiG leaders were under the impression that an agreement had been reached.  They

understood the Secretary would recommend the second application and that they were all in agreement regarding how the provisions of the agreement should be phrased.

175. Dexter offered to prepare a letter agreement reflecting the mutual understanding. AiG representatives asked Dexter if he would submit a draft to them first, just to confirm agreement on all details, and Dexter promised to do so.

176. However, two days later, on July 11, 2014, Dexter forwarded the letter agreement to AiG counsel without first sending a draft, as had been agreed.

177. In this July 11, 2014 letter, Dexter confirmed the understanding reached at the July 9, 2014, meeting that the previous reference to discrimination in hiring in the agreement would be replaced by a covenant to comply with state and federal laws relating to employment. The letter also stated that AiG reaffirmed the representations made by AiG in the May 5 letter.

178. AiG leaders had some concerns about this agreement and believed additional clarity would be beneficial.

179. AiG counsel asked if an edit could be made to better reflect the parties' mutual understanding, but Dexter declined to make any changes to the letter agreement. This stance was disconcerting. Nevertheless, presuming a mutual understanding on pertinent matters, based on representations made during the meeting, AiG leaders decided to sign the letter agreement, because the AiG leaders thought they could rely on the understanding reached during the July 9, 2014 meeting, and the specific provisions of the letter agreement that the previous reference to discrimination in hiring in the agreement would be replaced by a covenant to comply with state and federal laws relating to employment. On July 15, 2014, AiG counsel signed on AiG's behalf.

180. Secretary Stewart soon recommended the application for preliminary approval, and, on July 29, 2014, the Ark project received preliminary approval for tourism incentives.

181.    In light of this encouraging development, AiG, Crosswater Canyon, and AE, LLC anticipated moving forward with the Ark project and receiving final approval for the tourism incentives upon receipt of an updated report from the independent consultant, Hunden Strategic Partners.

182.    However, on August 22, 2014, an organization operating under the name of Americans United for Separation of Church and State ("AU") wrote a letter to the KTDFA and Governor Beshear, copying Secretary Stewart, urging them to deny final approval of the tourism incentives for the Ark project.  AU directed state officials to a job posting by AiG for a computer-assisted design (CAD) technician that AU had discovered from regular trolling of the AiG website.  AU also denigrated the evangelistic aspects of the Ark project.  AU protested that the job posting and evangelical component of the project confirms AiG is a religious ministry, which, according to AU, should be barred from ever participating in a facially-neutral government incentive program.

183.    Shortly thereafter, on August 27, 2014, AiG received a letter from Secretary Stewart stating that he was unwilling to proceed with final approval due to information his office received about a recent job posting by AiG.  The Secretary advised that he was informed AiG posted a job hire for a CAD technician that would be involved in exhibit design work relating to the Ark project.  The new position required affirmation of each applicant's Christian testimony and agreement with AiG's statement of faith.

184.  The CAD technician job posting was made by AiG because it was a position to be filled by and for AiG, and not AE, LLC.  To date, AE, LLC has not adopted any hiring policies and has not hired any persons.  All work on the Ark project has thus far been completed solely by AiG employees.

185.    AiG leaders were dumbfounded by the position taken by the Secretary, given the agreement reached at the meeting and the letter agreement signed by AiG and the Commonwealth, allowing AiG to comply with state and federal laws about hiring in lieu of the previously requested condition that would have prevented AiG and/or AE, LLC from hiring based on religious preferences.

186.    On the following day, August 28, 2014, AiG counsel wrote the Secretary back, pointing out that the position was posted by AiG, not AE, LLC.  Counsel further reminded the Secretary that AiG and/or AE, LLC are free to have religious preferences in hiring consistent with state and federal law and as agreed upon in the July 9 meeting and as confirmed in the July 11, 2014 letter agreement. AiG counsel further requested that Kentucky officials stand by their previous commitments.

187.    One week later, on September 4, 2014, Secretary Stewart replied to the August 28 letter, remarking that the agreement to comply with state and federal law was not intended to replace the condition that AE, LLC not have religious preferences in hiring, even though the Cabinet's attorney, Dexter, had drafted the letter agreement and he had made no mention of this condition in that agreement.  The Secretary insisted that AE, LLC provide express written assurance that it would not utilize religious preferences in hiring in order for its application to be considered for final approval.

188.    Representing yet another good faith effort to resolve the outstanding issues, AiG counsel contacted Dexter again, offering to have another meeting in person, which was eventually scheduled for November 24, 2014.

189.    This meeting took place on the scheduled day in Frankfort, Kentucky, with various Commonwealth officials, including Dexter, Secretary Stewart, and Michael Mangeot, Kentucky Commissioner of Travel.  Several AiG representatives also attended the meeting.

190.    At the meeting, AiG leaders and counsel reiterated their concerns, as set forth in the August 28, 2014 letter.  In turn, Secretary Stewart and Dexter reiterated their position as set forth in the Secretary's letter of September 4, 2014.

191.    AiG leaders and counsel tried to prevail upon Secretary Stewart to consider the constitutional ramifications of his actions being taken against AE, LLC in refusing to let the second application go forward to the KTDFA. The Secretary was not persuaded. The Secretary was requested to provide any legal support for his position, since it directly refuted the significant research he had been provided that his actions would not only violate the First Amendment of the U.S. Constitution and federal statutes, but also KRS 446.350, *et seq.*

192.    Secretary Stewart failed to provide any legal support for his position and stated that the decision was his alone and that he had decided to not let KTDFA consider the second application.

193.    Secretary Stewart specified two bases for his decision: 1) the intention of AiG and AE, LLC to utilize religious preferences in hiring for the Ark project; and 2) the project's religious messaging, that he opined would "advance religion."

194.    Following the meeting, AiG awaited the Hunden report to confirm the Ark Project's eligibility for the tourism incentives.

195.    On December 3, 2014, Hunden submitted its report on the second AiG application. Again, the independent consultant concluded: "The Project is expected to meet the requirements for the KTDA's rebate program."

196.    Following the release of the report, AiG counsel sent a letter to Secretary Stewart dated December 8, 2014, to remind him of the constitutional dilemma created by his actions in refusing to allow the second application to go forward. The letter included legal citations substantiating AiG's legal position.

197.    On December 10, 2014, Secretary Stewart replied in correspondence to AiG counsel and refused to alter his stance. He confirmed that he and the Commonwealth "will take no further action on Ark Encounter's application."

198.    As a basis, Secretary Stewart reiterated that he would not allow the application to go through because the Cabinet would not countenance any organization seeking tourism incentives to have religious preferences in hiring or to convey religious messaging.

**Substantial Adverse Impact from the Secretary's Decision**

199.    AiG, Crosswater Canyon, and AE, LLC are proceeding with phase one of the Ark project. After purchasing the land, they are compelled to build the Ark attraction in Grant County, Kentucky, as planned, despite the unanticipated and unjustified decision of Kentucky officials to block tourism incentives.

200.    However, the refusal of Kentucky officials to let AE, LLC receive tourism rebate incentives greatly impacts the projected cash-flow and planning of the remaining phases of the Ark attraction.

201.    AiG, Crosswater Canyon, and AE, LLC anticipated receiving approximately $18 million dollars in tourism/sales tax rebate incentives under the KDA Act program, which factored heavily in their development and operational plans. If the State is allowed to deny this applicant's participation in the KDA Act program, the decision will have a significant and harmful economic

impact to the project, and will adversely affect cash-flow and unduly delay the construction of the next important phases of the project.

202.    This cloud of uncertainty with the tourism incentives also affects planned expenditures under the current budget as well as future budgets.

203.    Without the injunctive and declaratory relief requested herein, AiG, Crosswater Canyon, and AE, LLC are presently suffering and will continue to suffer irreparable harm.

204.    AiG, Crosswater Canyon, and AE, LLC have no adequate remedy at law.

## FIRST CAUSE OF ACTION

### Violation of Freedom of Speech as provided in
### First Amendment to the U.S. Constitution

205.    Plaintiffs repeat and reallege each and every allegation as set forth above.

206.    The religious speech of AiG, Crosswater Canyon, and AE, LLC is protected speech under the First Amendment.

207.    The KTD Act, on its face and as applied by the Secretary and other Kentucky officials, and related policies and practices:

a.      are vague and overbroad;

b.      single out religious speech for discriminatory treatment in favor of non-religious speech;

c.      single out some religious speech for discriminatory treatment in favor of other religious speech;

d.      discriminate against speech because of its content;

e.      discriminate against speech on the basis of viewpoint;

40

f.      restrain constitutionally-protected speech in advance of its expression, with virtually no guidelines or standards to guide the discretion of officials charged with enforcing the KTD Act;

g.      chill the free speech of AiG, Crosswater Canyon, AE, LLC, and of other citizens and organizations wishing to participate in the program for tourism incentives;

h.      lack narrow tailoring, fail to achieve any legitimate government purpose, and fail to leave open alternative avenues for expression; and

i.      allow government officials to condition a discretionary benefit on a viewpoint-discriminatory basis.

208.    Defendants have no compelling or legitimate reason justifying their censorship of religious viewpoints sought to be expressed by AiG, Crosswater Canyon and AE, LLC.

209.    Defendants therefore have violated the Free Speech Clause of the First Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment.

## SECOND CAUSE OF ACTION

### Violation of Expressive Association as provided in First Amendment to the U.S. Constitution

210.    Plaintiffs repeat and reallege each and every allegation as set forth above.

211.    The First Amendment protects the rights of groups and organizations to associate for the purpose of engaging in expressive activities.

212.    The First Amendment guarantees the right to associate with others in the pursuit of religious and cultural ends.

213.    AiG, Crosswater Canyon, and AE, LLC are organizations that seek to live out and express their Christian beliefs, including their beliefs about Noah's Ark and the Flood and beliefs about salvation through Jesus Christ.

41

214. The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, have the effect of singling out and excluding religious organizations from applying for tourism incentives, which inhibits Plaintiffs from associating in such a way to achieve their respective missions and goals.

215. No legitimate state interest can justify this limitation on the right to free expressive association.

216. Defendants therefore have violated the Free Speech Clause of the First Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment.

## THIRD CAUSE OF ACTION

### Violation of the Free Exercise Clause as provided in
### First Amendment to the U.S. Constitution

217. Plaintiffs repeat and reallege each and every allegation as set forth above.

218. AiG, Crosswater Canyon, and AE, LLC adhere to and maintain religious beliefs that are central to their respective missions and purposes.

219. The Free Exercise Clause requires the government remain neutral in respect to differing viewpoints on religion and to avoid unequal treatment of different religions or unequal treatment between religion and non-religion.

220. The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, substantially burden the religious expression of AiG, Crosswater Canyon, AE, LLC by preventing them from accessing the tourism incentives program because of how they express their religious beliefs.

221. Defendants have no compelling or legitimate reason justifying the infringement on religious beliefs.

14670148.1

222.     Defendants therefore violate the Free Exercise Clause of the First Amendment to the United States Constitution, made applicable to the states under the Fourteenth Amendment.

## FOURTH CAUSE OF ACTION

### Violation of the Equal Protection Clause as provided in the Fourteenth Amendment to the U.S. Constitution

223.     Plaintiffs repeat and reallege each and every allegation as set forth above.

224.     Under the KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, organizations that have pursued projects similar to the Ark project have been granted access to the tourism incentive program while AiG, Crosswater Canyon, and AE, LLC have been precluded from accessing the program due to their religious beliefs as expressed in their personnel and messaging.

225.     Defendants intentionally treated AiG, Crosswater Canyon, AE, LLC differently than other similarly-situated organizations based on the viewpoint of their expression.

226.     Defendants have no compelling or legitimate reason justifying their disparate treatment of AiG, Crosswater Canyon, and AE, LLC.

227.     The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, therefore violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

## FIFTH CAUSE OF ACTION

### Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution

228.     Plaintiffs repeat and reallege each and every allegation as set forth above.

229.     The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, are vague and lack sufficient objective standards to curtail the

43

discretion of government officials. This unbridled discretion and vagueness permit Defendants to enforce the KTD Act in an *ad hoc* and discriminatory manner.

230.   Defendants have no compelling or legitimate reason justifying their vague law, policies, and practices.

231.   The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, therefore violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

## SIXTH CAUSE OF ACTION

### Violation of the Establishment Clause of the First Amendment to the U.S. Constitution

232.   Plaintiffs repeat and reallege each and every allegation as set forth above.

233.   The Establishment Clause, as set out in the First Amendment to the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, prohibits government hostility toward religion.

234.   The Establishment Clause also prohibits the government from favoring one religious denomination or religious viewpoint over another or an irreligious perspective.

235.   The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, single out and exclude religious groups and organizations from participating in the tourism incentives program, and are not neutral toward religion, but are invidious, and reflect open hostility toward religion.

236.   No legitimate state interest can justify the hostility toward the religion of AiG, Crosswater Canyon, and AE, LLC.

237.   The KTD Act, on its face and as applied by the Secretary and Kentucky officials,

and related policies and practices, excessively entangle government with religion by requiring government officials to investigate, monitor, and determine whether a particular religious group is too religious for the program.

238.    The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, therefore violate fundamental right to avoid governmental hostility toward their religion and the freedom from excessive governmental entanglement with religion, as set out the Establishment Clause of the First Amendment to the U.S. Constitution.

## SEVENTH CAUSE OF ACTION

### Violation of Section 5 of the Kentucky State Constitution

239.    Plaintiffs repeat and reallege each and every allegation as set forth above.

240.    Section 5 of the Kentucky State Constitution provides that "the civil rights, privileges, or capacities of no person shall be taken away, or in anywise diminished…on account of his belief or disbelief of any religious tenet, dogma or teaching.  No human authority shall, in any case whatever, control or interfere with the rights of conscience."

241.    By conditioning participation in the tourism incentives program on AiG, Crosswater Canyon, and AE, LLC abandoning expression of their religious beliefs, as expressed in the personnel policies as well as their speech, Defendants have diminished those beliefs and interfere with the right of conscience.

242.    The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, therefore violate Section 5 of the Kentucky State Constitution.

## EIGHTH CAUSE OF ACTION

### Violation of KRS 446.350

243.    Plaintiffs repeat and reallege each and every allegation as set forth above.

244.     KRS 446.350 states that "Government shall not substantially burden a person's freedom of religion…unless the government proves by clear and convincing evidence that it has a compelling government interest…."

245.     KRS 446.350 further provides that wrongful burdens include indirect burdens, such as withholding benefits, exclusion from programs, or access to facilities.

246.     As an integral part of their religious beliefs and belief system, AiG, Crosswater Canyon, and AE, LLC wish to express those beliefs through their messaging and personnel.

247.     The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, place an intolerable burden on AiG, Crosswater Canyon, and AE, LLC, requiring them to forego their religious mission, purpose, and identity in order to participate in the tourism incentives program.

248.     The KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, therefore violate KRS 446.350.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs AiG, Crosswater Canyon, and AE, LLC respectfully request the following relief:

A.     That this Court issue Preliminary and Permanent Injunctions enjoining Defendants, Defendants' agents, employees, and all persons in active concert or participation with them from applying the KTD Act and related policies or practices to exclude religious organizations and/or organizations that wish to express religious viewpoints through personnel and messaging, from participating in the KTD tourism incentives program.  AE, LLC specifically seeks a preliminary and permanent injunction allowing it to participate in the program that would allow it to receive incentives as mandated by the KTD Act.

46

B.      That this Court render a Declaratory Judgment declaring that the policy and practice of prohibiting religious organizations and/or organizations that wish to express religious viewpoints through personnel and messaging from participating in the KTD tourism incentives program violates the U.S. Constitution, the Kentucky Constitution and KRS 446.350;

C.      That this Court render a Declaratory Judgment declaring that Defendants' decision, pursuant to the KTD Act, on its face and as applied by the Secretary and Kentucky officials, and related policies and practices, prohibiting AiG, Crosswater Canyon, and AE, LLC from participating in the KTD tourism incentives program violated their rights under the U.S. Constitution, the Kentucky Constitution, and KRS 446.350;

D.      That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

E.      That this Court award AiG, Crosswater Canyon, and AE, LLC nominal damages for the violation of their rights;

F.      That this Court award AiG, Crosswater Canyon, and AE, LLC their costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

G.      That this Court grant such other and further relief as this Court deems equitable and just.

## VERIFICATION OF COMPLAINT

I, Ken Ham, President/CEO of Answer in Genesis, a citizen of the United States and a resident of Kentucky, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the factual allegations therein, and that the facts as alleged therein are true and correct.

Executed this 5th day of February, 2015

_____
KEN HAM
President/CEO of Answers in Genesis, Inc.


Respectfully submitted,

/s/ Nathan W. Kellum                                      /s/ J. Michael Johnson
NATHAN W. KELLUM*                                 J. MICHAEL JOHNSON*
TN Bar No. 13482; MS Bar No. 8813            LA Bar No. 26059
Center for Religious Expression                    Freedom Guard, Inc.
699 Oakleaf Office Lane, Ste. 107107           2250 Hospital Drive, Suite 248
Memphis, TN 38117                                     Bossier City, LA 71111
(901) 684-5485 – Telephone                          (318) 658-9456 - Telephone
(901) 684-5499 – Fax                                    (318) 658-9605 - Fax
Email: nkellum@crelaw.org                           Email: mjohnsonlegal@gmail.com

Attorney for Plaintiffs                                    Attorney for Plaintiffs


*Motions for Admission *pro hac vice* filed concurrently.

/s/ Robert B. Craig
ROBERT B. CRAIG (KBA No. 15590)
JAMES M. DICKERSON (KBA No. 96075)
Taft Stettinius & Hollister LLP
1717 Dixie Highway, Suite 910
Covington, KY 41011
(859) 547-4300 - Telephone
(513) 381-6613 - Fax
Email: craigr@taftlaw.com

Attorneys for Plaintiffs

14670148.1