UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| ARK ENCOUNTER, LLC, | ) | |
| CROSSWATER CANYON, INC., and | ) | |
| ANSWERS IN GENESIS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No: 15-13-GFVT |
| | ) | |
| V. | ) | **OPINION** |
| | ) | **&** |
| DON PARKINSON, in his official capacity | ) | **ORDER** |
| as Secretary of the Kentucky Tourism, Arts | ) | |
| and Heritage Cabinet, MATT BEVIN, in his | ) | |
| official capacity as Governor of the | ) | |
| Commonwealth of Kentucky, and BOB | ) | |
| STEWART in his individual capacity,[1] | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

Rising on what was once farmland near the community of Williamstown, Kentucky, is what purports to be an exact replica of the ark that figures prominently in the Old Testament story of a great flood that covered the earth. The modern-day Noah that is constructing the replica hopes that its almost $100 million investment will produce a successful tourist attraction. At first, the Kentucky Tourism Cabinet, with the same hope, approved tax incentives for the project. But then, representatives of the Commonwealth, concerned that the project was going to "advance religion," reversed course; the reason: providing the tax incentives would be contrary to the First Amendment protection from the state establishment of religion.

---

[1] The instant suit was filed during a former administration, and since that time a new governor and a new secretary of the Tourism Cabinet have taken office. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d),Governor Matt Bevin and Secretary Don Parkinson are hereby substituted for Steven Beshear and Bob Stewart, except for the claims against the former Secretary Stewart in his individual capacity. Fed. R. Civ. P. 25(d)(1).

So, in essence, the question presented here is this: if a tourist attraction, even one that as described here "advances religion," meets the neutral criteria for tax incentives offered by the Commonwealth of Kentucky, can the Commonwealth still deny the incentive for Establishment Clause reasons?  This opinion is long but the answer to that question is short -- no.  The reasons this is true based on these facts follow.[2]

# I

## A

Under the Kentucky Tourism Development Act (KTDA), Ky. Rev. Stat. § 148.850, *et seq.*, Kentucky provides an incentive program for qualifying tourism attractions "in order to advance the public purposes of relieving unemployment by preserving and creating jobs that would not exist if not for the incentives offered by the authority to approved companies, and by preserving and creating sources of tax revenues for the support of public services provided by the Commonwealth."  Ky. Rev. Stat. § 148.853(1)(b).  A wide variety of projects have qualified for these incentives, including a broad spectrum of organizations with different purposes and presenting diverse messages.  Such projects have included attractions such as the Newport Aquarium, 21C Museum Hotel, Kentucky Speedway, Kentucky Kingdom, and multiple bourbon visitor centers such as Buffalo Trace, Maker's Mark, and Old Forester distilleries.  [R. 1, ¶ 65.] Since the KTDA's enactment the Commonwealth has approved over $1 billion in new tourism investments, but so far AiG is the only applicant with a religious affiliation.  [*Id.*].

---

[2] Plaintiff Ark Encounter, LLC is a limited liability company created in order to "manage a multi-acre, paid-admission complex consisting of buildings, exhibits and other amenities" focused on the Biblical account of the Genesis Flood.  [R. 1 at ¶ 11.]  The sole member of Ark Encounter is Plaintiff Crosswater Canyon, Inc., a 501(c)(3) non-profit whose purpose is to support the ministry of Answers in Genesis.  [*Id.* at ¶ 12.]  Plaintiff Answers in Genesis, Inc., (AiG) is a "Christian non-profit ministry endeavoring to proclaim the absolute truth and authority of the Bible."  [*Id.* at ¶¶ 13, 16.]  Together, these Plaintiffs (collectively referred to as "AiG") sue Defendants (collectively referred to as "the Commonwealth") for excluding them from participation in a tourism incentive program.

AiG distributes publications, and also provides museums, facilities, and exhibitions related to the Bible concerning "origins and history."  [R. 1, ¶¶ 13, 16.]  In 2007 AiG opened its Creation Museum in Petersburg, Kentucky, which has attracted approximately 2.3 million visitors.  [R. 15-1 at 7.]  In light of that success, AiG's leadership approved a new project in October 2011 – "a theme park centered around a full-scale replica of Noah's Ark" [*id.*], designed "as a means of expanding the ministry's mission of proclaiming biblical authority and the Gospel of Jesus Christ."  [R. 1, ¶ 29; R. 18-1 at 13.]  The initial concept included a variety of exhibits such as an extensive petting zoo and aviary with live shows, a pre-Flood town with retail and entertainment, a children's play area, a replica of the Tower of Babel, geology and Biblical history exhibits with special effects, a first-century village, and several restaurants and food carts as well as retail outlets and kiosks.  [R. 1, ¶¶ 45-46; R. 15-5 at 11-12.]

After researching surrounding states for the best location for this theme park, AiG chose to build in Kentucky, not only because of its proximity to the Creation Museum, but also because of the unique incentives for tourist attractions Kentucky offered.  [R. 15-1 at 8; R. 18-1 at 16.] Based on a 2008 marketing feasibility study, AiG knew the proposed Ark project would exceed the KTDA eligibility requirements and accordingly met with officials from the Kentucky Department of Travel and Tourism to discuss the project. [R. 15-1 at 8.]  Afterward, AiG's counsel provided a legal memorandum addressing concerns about separation of church and state. [*Id.* at 9.]  State and local officials expressed enthusiasm for the project, and in October 2010 assured AiG that any legal concerns were fully addressed and that the project would qualify for the incentives under the KTD Act.  [*Id.* at 10.]  Also in October 2010, then-Governor Beshear met with AiG leaders and pledged to publicly support AiG's application.  [*Id.* at 10.]

3

After a 2009 study confirmed the Ark project would attract millions of tourists and create thousands of new jobs, officials from Indiana and Ohio expressed interest in finding property for the project in their states, but partly because of the KTDA incentives and the enthusiasm of Kentucky leaders for the project, AiG determined Kentucky was the best location, and in 2010 signed a contract for an option to purchase over 500 acres of land in Williamstown, Kentucky. [*Id*. at 9.]  Also in 2010, AiG formed the separate non-profit subsidiary Crosswater Canyon and another subsidiary Ark Encounter, LLC (AE) to oversee and manage the Ark attraction. [R. 1, ¶¶ 50-51; R. 15-1 at 9.]  In November 2010, AE submitted its first application for the economic incentives under the KTDA.  [R. 15-1 at 10; R. 15-2.]  According to Plaintiffs, AE agreed to another option to purchase additional acreage in Grant County soon afterward, based on Kentucky officials' enthusiastic endorsement.  [R. 15-1 at 10.]  On December 1, 2010, AiG held a joint press conference with then-Governor Beshear in Frankfort to publicly announce the Ark Project as a new tourist attraction in Kentucky. [*Id*. at 11.]  At the conference AiG leaders explained the religious aspects of the project, including their intention for it "to lend credence to the biblical account of the Flood and Noah's Ark," and also to include "a Gospel message."  [*Id*. at 11.]  During the conference, Governor Beshear announced his enthusiasm for the project, commenting that it did not raise any constitutional issues and that he believed there would be no problems in securing its approval.  [*Id*. at 11.]

On December 20, 2010, the Kentucky Tourism Development Finance Authority (KTDFA) gave preliminary approval of AE's first application and entered into the first Memorandum of Agreement (MOA) with AE, LLC, reflecting the Commonwealth's intent to provide tax incentives subject to satisfying the KTDA's requirements.  [R. 15-4.]  As part of the agreement, AE retained and paid for an independent consultant, Hunden Strategic Partners

4

(Hunden) to confirm that the Ark project met the necessary economic impact requirements. [*Id.* at 11-12.]  On May 6, 2011, Hunden submitted a report to state officials concluding that the project met all the objective criteria required by the KTDA.  [R. 15-5.]  On May 19, 2011, the KTDFA granted final approval for the Ark Project to receive the KTDA's tax incentives and entered into a Tourism Development Agreement (TDA) with AE, LLC, which stated that the Ark project was eligible to receive incentives of up to 25% of approved costs incurred through May 19, 2014, and affirmed that without that assistance "the Company would not engage in the Project."  [R. 15-6; R. 15-1 at 12.]  The TDA also contained a provision that required AE to waive its right to exercise religious preferences in hiring for the Ark project – a provision not included in agreements with other participants in the program.  [*Id.*]  AE accepted the language at the time because it was told that it was obligatory, and because AiG intended to rely on private investment so as to include other "safeguards to preserve the religious mission and identity of their project."  [R. 15-1 at 11-12; R. 18-1 at 16.]

After obtaining final approval for the project, AiG exercised its option to purchase land in Grant County and prepared the offerings for private investors.  [R. 15-1 at 12.]  According to AiG, however, the economic downturn resulted in the investor subscription process taking longer than anticipated, and AiG had to reduce its budget for the project and change its focus to funding an initial phase and then complete the project under a phased development plan.  [*Id.*; R. 18-1 at 16.]  Partly as a result, AiG's board of directors changed from the private investment model to utilizing taxable bonds as the primary financial structure for the Ark project.  [R. 15-1 at 13.]  Because of these changes, the project could not be completed by May 2014 as originally anticipated, and state officials advised that a new application was required.  [*Id.* at 13.]  Accordingly, AE submitted a second application on March 28, 2014, that was "virtually

identical" to the first application except for specifying that the project would be completed in several phases.  [*Id.*]  The purpose and religious nature of the Ark Project remained the same.

On April 24, AE received a letter from William Dexter, general counsel for the Kentucky Department of Travel and Tourism, stating that "[a]dditional information has come to our attention that further describes the Ark which requires us to inquire further to determine the suitability of the project for state incentives."  [R. 15-8 at 1.]  The only such information cited by the letter was a recent press conference in which the president of AiG, Ken Ham, and the director of museum design described the evangelical mission of AiG and noted that the third floor of the Ark project would contain an exhibit called "Christ the Door Theater" in furtherance of AiG's evangelistic mission.  [*Id.* at 1-2.]  Based on that press release, Dexter's letter stated that providing tax incentives to the project would "amount[] to impermissible state funding of religious indoctrination."  [*Id.* at 2.]  The letter further stated that in light of the statements at the press conference the Ark Project "has changed from a tourism attraction to an extension of AiG's ministry," and that the Cabinet could not proceed with the application without additional information about "what specific activities will – and will not – take place on the Ark or the surrounding property."  [*Id.*]

AiG maintains that it had always been forthright about the Christian nature and evangelistic purpose of the Ark project, and as early as 2009 informed state officials of its religious nature and gave officials a tour of the Creation Museum "so they could get a sense of how the Ark attraction would be presented to the general public."[3]  [R. 15-1 at 8, 14.]  AiG concedes that between the first and second applications, some further details about the project

---

[3] Defendants acknowledge that AiG has intended the Ark to be part of its ministry and mission for a long time – from "[s]oon after AiG opened its Creation Museum" – and that the Ark was intended from the beginning to be an evangelistic outreach.  [R. 18-1 at 13.] This begs the question of why Mr. Dexter should seem surprised by this fact as late as April 2014.

were refined, including the addition of an exhibit called the "Christ the Door" theater designed to present an evangelistic message.  [R. 1, ¶¶ 137-38, 159.]  This exhibit apparently triggered Defendants' concern about religious indoctrination.  [R. 15-8, R. 18-1 at 15-17.]   In response to Dexter's April 2014 letter, AiG's counsel wrote to clarify that no religious indoctrination would take place in the Park, no one would be forced to accept any views presented there, and that the park would be open to everyone regardless of their religious beliefs.  [R. 15-9.]

After further correspondence over questions of "religious indoctrination," Dexter informed AiG's counsel that AiG had adequately assured the Cabinet "that the Ark project has not materially changed from that previously submitted in its original 2010 application" other than the phased development plan, and that AiG also had assured the Cabinet that "no visitor to the attraction will be subject to religious proselytizing or be forced to accept a certain view or interpretation of Scripture, nor will the project function as a church or contain a place designated for religious worship."  [R. 15-12.]  Based on those assurances the letter stated that the Secretary would recommend consideration of AE's application for preliminary approval, but included a stipulation that AE must not discriminate on the basis of religion in hiring, which was not required by the KTDA and was not imposed on any other applicants.  [*Id.*; R. 15-1 at 15.]  AIG's counsel reiterated that as a religious organization AiG should be able to maintain its identity through its hiring practices without violating federal or state employment law.  [R. 15-13.] Secretary Stewart, however, wrote another letter on June 24, 2014, stating that he would recommend the application for approval based on the terms stated in Dexter's previous communication, but that if AE did not want to proceed on that basis the application would be withdrawn from consideration. [R. 15-14.]

AiG's counsel met with then-Secretary Stewart and his counsel on July 9, 2014, and asserted that under the modification in the corporate structure for the project, AiG could utilize religious preferences in hiring but agreed to fully comply with all applicable federal and state laws relating to hiring and otherwise.  [R. 15-1 at 16.]  The state officials indicated they understood AiG's concerns and said they would rely upon AIG's earlier assurances that no visitor to the Park would be forced to accept the views presented there.  [*Id*.]  According to Defendants, the Cabinet believed that AIG's representation that it would comply with all applicable state and federal laws meant "AiG would not proselytize or engage in discriminatory hiring."  [R. 24 at 14.]  AiG, however, believed that as a religious organization it qualified for an exemption in Title VII that would allow them to hire those who agreed with their religious views.  [*Id*. at 11.]  Accordingly, in August 2014, AiG posted employment positions for various jobs related to the Ark project, which included a requirement that applicants agree with AiG's statement of faith.  [R. 18-1 at 17.]

On July 29, 2014, the Ark project received preliminary approval for the KTDA incentives.  [R. 15-16.]  The second MOA did not contain any requirements or agreements concerning hiring practices other than an agreement that AE comply with all applicable state and federal laws and regulations, as previously agreed.  [*Id*. at 5.]  On August 27, however, Secretary Stewart sent AiG a letter objecting to a recent job posting on AiG's website.  Apparently, on August 22, 2014, a group called Americans United for Separation of Church and State (AU) sent a letter to Governor Beshear and the KTDFA protesting AiG's participation in the tourism incentive program and specifically contending that AiG's job postings requiring applicants to agree with AiG's statement of faith should prevent AiG from being able to benefit from the

incentives offered under the KTDA.[4] [R. 15-18.]  Secretary Stewart referenced these job postings, stating that based on their requirement that applicants agree with AiG's statement of faith, "the Commonwealth doesn't believe that Ark Encounter, LLC will be complying with state and Federal law in its hiring practices."  [R. 15-17.]  Based on that belief, the Commonwealth was "not prepared to move forward with consideration of the application for final approval" without AE's assurance that it would not discriminate on the basis of religion in hiring.  [*Id.*]  In a subsequent letter, Secretary Stewart stated without any support or citation to legal authority that "[t]he Commonwealth does not provide incentives to any company that discriminates on the basis of religion," and again insisted that AE provide "express written assurance" that "it will not discriminate in any way on the basis of religion in hiring for the project" and must "revise any and all [job] postings for the Ark Encounter project accordingly, for its application to be considered for final approval."  [R. 15-20.]

On December 3, 2014, Hunden submitted its independent report on AiG's second application.  [R. 15-21; R. 18-1 at 18.]  Because of the shift to a phased development, the second Hunden report focused primarily on the first-phase Ark attraction, but concluded that it still qualified as "an entertainment facility" under Ky. Rev. Stat. § 148.851. [R. 15-21 at 5, 8.] Despite the change in focus, the report estimated that the project still would add several hundred new jobs, would attract 92.1 percent of its visitors from outside of Kentucky by the peak year of operation, and is "expected to have a net positive economic impact on Kentucky as well as a positive net fiscal impact on Kentucky," even "after subtracting out expected KTDA rebates."[5]

---

[4] The Court permitted Americans United for Separation of Church and State to file an amicus memorandum in this case, which the Court has considered in rendering its opinion.  [R.56; R. 59.]

[5] The Hunden report further projected that the new sales and income tax from the Ark project would be between $40.6 million and $34.2 million depending on one of two scenarios described in the report, and that after subtracting the maximum potential rebate and cost of a new interchange on I-75, the net expected fiscal impact to Kentucky would be between $11.4 million and $4.9 million over the ten-year period. [R. 15-21 at 11-12.]

[*Id.* at 9, 10-11].  After reviewing the changes to the project, the second Hunden report again concluded that the Ark Project "meets all criteria identified by the [KTDA]."  [*Id.* at 13.]

Nevertheless, on December 10, 2014, Secretary Stewart sent a letter to AiG stating that "based on various" job postings on AiG's and AE's websites, "reports from Ark Encounter investors meetings," and recent correspondence, the Ark project appeared to have "evolved" from simply a tourist attraction "to an extension of AiG's ministry," and therefore could not qualify for the tax incentives.  [R. 15-23 at 1.]  The letter expressly stated two reasons for the Commonwealth's denial of AiG's second application: "1) the Commonwealth will not grant incentives to a company that intends to discriminate in hiring its employees based on religion; and 2) [i]t is a violation of the Constitution for the Commonwealth's incentives to be used to advance religion."  [*Id.*]  No legal authority was cited in support of this conclusion, nor were any references made to the KTDA's requirements.  [*Id.* at 2.]  The only factual support referenced was a February 2014 press conference at the Creation Museum where AiG President Ken Ham stated that the Ark Project would present "an evangelical, yet entertaining, Gospel message"; a "Hammer & Peg ceremony" on May 1, 2014 where supporters of the project were told about the Christ the Door theater exhibit; the website design for the Ark featuring the Christ the Door theater and a room called "Why the Bible is True"; and a fundraising letter in which the Ark's purpose was characterized as evangelistic.  [*Id.* at 2.]

AiG is currently proceeding with construction of the first phase, but contends that the Commonwealth's denial of the incentives impacts the "projected cash-flow, budgeting, and planning" of the remaining phases. [R. 15-1 at 19-20; R. 24 at 14.]  Accordingly, AiG moves for a preliminary injunction, arguing that the rejection of their application violates their

Constitutional rights under the First and Fourteenth Amendments.[6]  [R. 15-1.]  In response, the Commonwealth moves to dismiss the Complaint on the grounds that allowing AiG's participation in the program violates the prohibition against establishing a religion under both the federal and state constitutions.  [R. 18.]

**B**

The KTDA program provides "a sales tax incentive based on the Kentucky sales tax imposed on sales generated by or arising at the tourism development project."  Ky. Rev. Stat. § 148.853(3)(a).  The incentive allows an approved project to recover the lesser of either its total amount of sales tax liability or up to twenty-five percent (25%) of its approved development costs over a period of ten (10) years.  § 148.853(3)(b).  The Act specifically states that these incentives "are proper governmental and public purposes for which public moneys may be expended," and also states that "the creation or expansion of tourism development projects is of paramount importance mandating that the provisions [of the Act] be liberally construed and applied in order to advance public purposes."  § 148.853(1)(c)-(d).

To qualify for these incentives, the proposed project must fall into one of several listed categories and meet the requirements for that category.  Ky. Rev. Stat. § 148.853(2).  The parties do not appear to dispute that the proposed project at issue falls into the category of "a tourism attraction project."  A proposed project also must meet the following requirements: (1) its total eligible costs must exceed $1,000,000; (2) the attraction must be open to the public at least one hundred (100) days of the year including the first year of operation; and (3) the project must attract at least twenty-five percent (25%) of its visitors from people who reside outside the Commonwealth.  § 148.8533(2)(a).  Applications for the program are submitted to the Secretary

---

[6] Initially, AiG also argued that Defendants' actions violated its rights under the Kentucky Constitution, but AiG subsequently agreed to withdraw its state law claims.  [R. 36 at 22.]

of Tourism, Arts and Heritage Cabinet for initial review, and if the cabinet determines that the project appears to meet the above requirements, the Secretary forwards the application to the KTDFA with a recommendation of preliminary approval. Ky. Rev. Stat. § 148.855. Once preliminary approval is granted, the cabinet selects an independent consulting firm to analyze the data supplied by the eligible company in order to determine whether the proposed project will meet the above requirements, and whether it will have a net positive fiscal impact on the Commonwealth by increasing tax revenues in excess of the incentives given to the company and without adversely affecting existing employment. § 148.855(4). The consultant then reports to the Office of the State Budget Director, and after reviewing that report along with all other relevant materials, the Secretary determines whether to recommend final approval of the project. § 148.855(6)–(9).

## II

### A

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't,* 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000)). In reviewing a motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, district courts must consider (1) whether there is a likelihood of success on the merits of the plaintiff's claim; (2) whether the plaintiff will suffer irreparable harm if the injunction is not granted; (3) whether others would be harmed by granting the injunction; and (4) whether the public good is served by issuing the injunction. *Leary,* 228 F.3d at 736 (citing *McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 459 (6th Cir. 1997) (en banc)). "These factors are to be balanced against one another

and should not be considered prerequisites to the grant of a preliminary injunction." *Id.* (citing *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 347 (6th Cir.1998)).  With that said, "'[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'"  *Jones v. Caruso,* 569 F.3d 258, 265–66 (6th Cir. 2009) (quoting *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998)).  In other words, "'because the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is ... whether the [regulation] at issue is likely to be found constitutional.'"  *Id.* (quoting *Connection Distrib. Co.,* 154 F.3d at 288); *see also Congregation Lubavitch v. City of Cincinnati,* 923 F.2d 458, 460 (6th Cir. 1991) (Because harm could be suffered by either party, and because the public interest depended on the correct application of First Amendment principles, the court's decision turned on the likelihood of success on the merits).  Accordingly, the resolution of the present case will turn on the question of the First Amendment claims at issue.

In a motion to dismiss pursuant to Rule 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief."  *DirecTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007) (citing *Carver v. Bunch,* 946 F.2d 451, 454–55 (6th Cir. 1991)).  When reviewing a Rule 12(b)(6) motion, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff."  *Id.* (citation omitted).  Such a motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Id.* (quoting *Ricco v. Potter,* 377 F.3d 599, 602 (6th Cir. 2004)).

13

Moreover, the facts that are pled must rise to the level of plausibility, not just possibility -- "facts that are merely consistent with a defendant's liability ... stop[ ] short of the line between possibility and plausibility." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  According to the Sixth Circuit, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).

## B

The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. Amend. 1.  These two clauses guarantee, "at a minimum . . . that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee v. Weisman*, 505 U.S. 577 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)); *Everson v. Board of Ed. of Ewing*, 530 U.S. 1, 15-16 (1947).  "From the outset, the Court has construed the give-and-take language of the two clauses to forbid government from using its power either to 'favor' or to 'handicap' any one religion or religion in general." *American Atheists, Inc. v. City of Detroit*, 567 F.3d 278, 288 (6th Cir. 2009) (citing *Everson*, 330 U.S. at 18).  The two clauses are often in tension with each other, as in the case at hand, because "[while the two Clauses express complementary values, they often exert conflicting pressures." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005); *see also Walz v. Tax Comm'n of City of NY,* 397 U.S. 664, 668-669 (1970) ("The Court has struggled to find a neutral course between the two Religion

Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other.").  Here, because AiG argues the Commonwealth's actions violate the Free Exercise Clause while the Commonwealth defends its actions by arguing that to do otherwise would violate the Establishment Clause, the instant dispute encompasses the interplay between these two clauses.

At the outset, it is worth noting that some interaction between church and state is "inevitable"; the question before us is whether such interaction actually creates an impermissible establishment of religion.  *Johnson v. Econ. Dev. Corp. of Cty. of Oakland*, 241 F.3d 501, 515 (6th Cir. 2001); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123 (1982) ("some limited and incidental entanglement between church and state authority is inevitable in a complex modern society").  When analyzing applicable First Amendment standards, Supreme Court Justice Breyer once noted that the Supreme Court "has found no single mechanical formula that can accurately draw the constitutional line in every case," and concluded that "no exact formula can dictate a resolution to [] fact-intensive cases."  *Van Orden v. Perry*, 545 U.S. 677, 699-700 (2005) (Breyer, J., concurring in judgment).  He further cautioned that in such "difficult borderline cases," there is "no test-related substitute for the exercise of legal judgment."  *Id*. at 700.  He warned that such judgment, however, "must reflect and remain faithful to the underlying purposes of the Clauses, and it must take account of context and consequences measured in light of those purposes."  *Id*. at 700.  In light of this caution, it is worthwhile to keep in mind the overall purpose of the First Amendment when applying the relevant standards.

As the Sixth Circuit has noted, "[f]or most of our history as an independent nation, the words of the constitutional prohibition against enactment of any law 'respecting an establishment of religion' were commonly assumed to mean what they literally said."  *Am. Civil Liberties*

15

*Union of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 293 (6th Cir. 2001).

When considering the history and context of the Establishment Clause, "it is clear that the

principal thrust of the prohibition was to prevent any establishment by the national government

of an official religion, including an established church such as that which existed in England at

the time the American colonies won their independence from the Crown." *Id.* In England, the

Church of England had special rights and privileges given by the government, English citizens

paid taxes specifically collected for the support of the established church, those who dissented

with the established church's teachings were fined, jailed, or otherwise punished, and most

government positions were closed to any who disagreed with the established church's doctrine.

*Id.* (citations omitted); *Everson,* 330 U.S. at 8-9.

Many settlers who came to America were seeking to avoid such control by the national

church and wanted to set up their own churches free from government interference. *Hosanna-

Tabor Evangelical Lutheran Church and School v. EEOC*, 132 S. Ct. 694, 702 (2012). Several

American colonies, however, still had established churches with laws ensuring government-

appointed ministers, compulsory tithes, and taxes for paying ministers' salaries and maintaining

church property. *See id.* at 703; *Everson*, 330 U.S. at 10-11. Even after independence, in many

states "attendance at the established church was mandatory, and taxes were levied to generate

church revenue. . . . Dissenting ministers were barred from preaching, and political participation

was limited to members of the established church." *Town of Greece, N.Y. v. Galloway*, 134 S.

Ct. 1811, 1837 (2014) (Thomas, J., concurring opinion) (citations omitted).

The First Amendment was adopted in this context and with the purpose of preventing

such practices. Those who drafted and ratified it sought to prohibit the new government from

filling ecclesiastical offices, setting up a national church, imposing forced tithes, or compelling

16

dissenters to worship in a particular way or support a particular church.  *See Hosanna-Tabor*, 132 S. Ct. at 703; *Everson*, 330 U.S. at 11-15; *Am. Civil Liberties Union of Ohio*, 243 F.3d at 293-94.  In emphasizing that "an element central to the original understanding of 'an establishment of religion' was that of *coercion*," the Sixth Circuit noted that James Madison, "the Father of the First Amendment," stated that the meaning and intent of the Establishment Clause was "that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience."  *Am. Civil Liberties Union of Ohio*, 243 F.3d at 294 (quoting 1 *Annals of Congress* 758 (Gales & Seaton's ed. 1834) (Aug. 15, 1789) (emphasis added in *ACLU of Ohio*)) (internal quotation marks omitted).  The court went on to emphasize that "the actions of the First Congress demonstrate, in sum … that to men active in public affairs when the First Amendment was adopted, the Establishment Clause meant just what it said."  *Id*. at 297.

In other words, "the Establishment Clause was meant to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government."  *Id*. at 298 (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* §1871, at 728 (1833)).  "The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and threat of penalty."  *Town of Greece*, 134 S.Ct. at 1837 (quoting *Lee*, 505 U.S. at 640 (Scalia, J., dissenting)).  On the other hand, however, "the Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious."  *Van Orden*, 545 U.S. at 700.

**1**

The so-called *Lemon* test is "[t]he long-standing (but not always applied) test for determining whether government action violates the Establishment Clause." *Am. Civil Liberties Union of Kentucky v. Grayson Cty., Ky.*, 591 F.3d 837, 844 (6th Cir. 2010).  In applying that test, courts generally uphold government action as long as the action or statute 1) has a "secular legislative purpose"; 2) "its principal or primary effect must be one that neither advances nor inhibits religion"; and 3) it does "not foster an excessive government entanglement with religion." *Id.*; *Lemon v. Kurtzman,* 403 U.S. 602 (1971); *see also Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 526 (6th Cir. 2012) (clarifying the use of the *Lemon* test in the Sixth Circuit).  "If we cannot answer "yes" to the first question and "no" to the second two, the challenged action violates the Establishment Clause." *Satawa*, 689 F.3d at 526.

Since *Lemon*, the Supreme Court has altered the first two prongs somewhat.  First, the Court has emphasized that the government's stated secular reason or purpose must be "genuine, not a sham, and not merely secondary to a religious objective." *McCreary County v. ACLU,* 545 U.S. 844, 865 (2005).  Concerning the second prong, the Supreme Court has also found that governmental action has a religious primary effect in situations where it "is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their religious choices." *County of Allegheny v. ACLU,* 492 U.S. 573, 595 (1989); *see also ACLU of Kentucky*, 591 F.3d 837 at 844-45 (explaining and citing the same).  In *Agostini v. Felton*, 521 U.S. 203 (1997), the Court "folded the entanglement inquiry into the primary effect inquiry," because both rely on the same kinds of evidence, and because the degree of entanglement relevant to the third *Lemon* test prong "has implications for whether a statute advances or inhibits religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 668-

69 (2002) (O'Connor, J. concurring opinion). In sum, at the most basic level "the Establishment Clause requires government to enact laws that are *neutral* as to religion, do not have the *purpose* of advancing religion and do not have the *primary effect* of advancing religion." *Am. Atheists*, 567 F.3d at 288-89 (alteration in original).[7]

As an initial matter, in analyzing the purpose of the government action at issue, we must keep in mind that "[t]he defining principle of Establishment Clause jurisprudence is that the First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion." *ACLU of Kentucky*, 591 F.3d at 844 (quoting *McCreary County,* 545 U.S. at 860) (internal quotation marks omitted); *see also Am. Atheists, Inc.*, 567 F.3d at 289 ("The most essential hurdle that a government-aid program must clear is neutrality – that the program allocates benefits in an evenhanded manner to a broad and diverse spectrum of beneficiaries."). This principle of neutrality "does not foreclose [government] from ever taking religion into account." *Lee,* 505 U.S. at 627 (Souter, J., concurring). It does, however, prohibit the government from "favor[ing] one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the Free Exercise Clause." *McCreary Cty., Ky.*, 545 U.S. at 875-76. Indeed, government neutrality is "an objective of the Establishment Clause, and a sensible standard for applying it," as well as "a prudent way of keeping sight of something the Framers of the First Amendment thought important." *Id*. at 876; *see also Walz*, 397 U.S. at 669-70.

---

[7] The Court acknowledges that the *Lemon* test has been often criticized, and is not consistently used or applied by the Supreme Court. *See Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S. Ct. 12 (2011) (Mem.). However, it has not been officially overruled, and the Sixth Circuit has stated that it is still the proper test for analyzing claims involving the Establishment Clause. *See Satawa*, 689 F.3d at 526 ("Although it has lost some of its luster, the test from *Lemon,* 403 U.S. 602, as refined by later Supreme Court opinions, guides our Establishment Clause analysis.").

**a**

In determining the government's purpose under the first prong of the *Lemon* test,

"[u]nless it seems to be a sham . . . the government's assertion of a legitimate secular purpose is

entitled to deference." *ACLU of Ohio v. Capitol Square*, 243 F.3d at 307 (citations and internal

quotation marks omitted).  Here, the KTDA specifically states that its purpose is a public one "of

relieving unemployment by preserving and creating jobs" through tourism projects and also

creating sources of tax revenue through the projects and their attraction to out-of-state tourists.

Ky. Rev. Stat. § 148.853(1)(c)-(d).  Clearly, bringing non-residents into Kentucky who will

spend money on food, lodging, gas, and tourist attractions will increase revenues and benefit the

state's economy through jobs and spending.  Such a purpose is plainly secular.  Neither the

language nor application of the KTDA indicate that its purpose is to aid or give preference to any

religion or religious sect.  Its language is entirely neutral.  The groups that have qualified for the

tax incentive so far include a wide variety of tourist attractions promoting such diverse interests

as bourbon, art, and roller coasters. [R. 1, ¶ 65.]  There is no language in the Act itself or in the

application requirements addressing religious affiliations or excluding groups based on religion.

The listed criteria required for qualifying projects to receive the incentive, are entirely

secular, such as eligible costs, days of the year the project will be open, and the percentage of

out-of-state visitors it is likely to attract; and such requirements do not address the content,

subject matter, or religious affiliation of any of the projects.  *See* Ky. Rev. Stat. § 148.853.  Thus,

the Act says nothing that could in any way be construed as granting a favor or preference to any

religion.  Moreover, neither party alleges, nor does the evidence presented thus far suggest, that

the Commonwealth's implementation or application of the Act has a secret or masked purpose of

advancing or promoting religion.[8]  Accordingly, the Act has a secular purpose and meets the first

prong of neutrality.  *See, e.g., Johnson*, 241 F.3d at 512 (a state's "decision to assist businesses in

their operation in order to create and maintain jobs – regardless of the type of business –

evidences a purpose that is both secular and understandable," and concluding that the strong

public interest in promoting and retaining commercial enterprises whether sectarian or secular

satisfied the first prong of the *Lemon* test) (internal citations and quotation marks omitted).

   The issue here appears to be the *application* of the tourism program, and specifically its

application to AiG.  "[T]he government violates the Establishment Clause when it acts with the

predominant purpose of advancing religion."  *ACLU of Ky*, 607 F.3d at 445-46 (quoting

*McCreary IV*, 545 U.S. at 860) (internal quotation marks omitted).  The Commonwealth's

concern that allowing AiG to participate in the program would violate the Establishment Clause

because of AiG's religious purpose misunderstands the concept of neutrality.  It is the

*government's* purpose that must be secular, and therefore the KTDA must be neutrally applied to

all applicants regardless of religious affiliation.  If a particular religious group receives more

favorable treatment than a secular group, or if a secular group receives more favorable treatment

than religious groups because they are secular, such treatment would violate the Establishment

Clause.  *See McCreary Cty., Ky.*, 545 U.S. at 875-76; *Epperson v. Arkansas,* 393 U.S. 97, 104

(1968); *Am. Atheists*, 567 F.3d at 289.  Because the KTDA is neutral, has a secular purpose, and

does not grant preferential treatment to anyone based on religion, allowing AiG to participate

along with the secular applicants cannot be viewed as acting with the predominant purpose of

advancing religion.  *ACLU of Ky*, 607 F.3d at 445-46.  If AiG, or any other group, meets the

neutral, secular requirements of the KTDA, and their qualification for the program is determined

---

[8] If anything, the Commonwealth's arguments in defense of this case are premised on a deep concern of potentially violating the Establishment Clause, and particularly a concern of avoiding any appearance of favoring a religious group or endorsing a particular religious viewpoint.

according to the neutral criteria specified in the Act, and not because of their religious affiliation, then the first prong of the *Lemon* test will be adequately met.[9]

Another part of the purpose analysis asks whether "an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act" would perceive it as a state endorsement of religion. *McCreary Cnty., Ky.*, 607 F.3d at 445 (quoting *McCreary IV*, 545 U.S. at 862) (internal quotation marks omitted); *Santa Fe Indep. Sch. Dist. v. Doe*, 540 U.S. 290 (2000). As stated above, however, there is nothing in the text, legislative history, or implementation of the KTDA that would lead a reasonable observer to think it is an endorsement of religion. Thus, the question is whether approving AiG's application would lead to a perception that the Commonwealth is endorsing AiG's religious beliefs.

We must keep in mind that AiG's proposed project is an amusement park centered on the Biblical story of Noah's Ark, but it is not a non-profit or a church. If the Ark Project meets the stated criteria for participation in the program, then by definition it is a tourist attraction, and as such, clearly has an entertainment element as well as a religious component. Tourists will pay money in order to gain entrance into the theme park, people will buy food and drinks there, and while many may come hoping to learn something about the Bible, the park will likely attract people of all different viewpoints. The reasonable observer would not think that AiG's participation along with other qualified applicants in a facially neutral tourism program has the predominant purpose of advancing religion, nor would a reasonable observer think that Kentucky is officially endorsing AiG's Christian beliefs any more than a reasonable observer would

---

[9]The Court acknowledges that facial neutrality alone is not determinative because the First Amendment was designed to protect against hidden government hostility as well, but here neither party alleges that the KTDA masks any hostility toward religion. *See Prater v. City of Burnside, Ky.*, 289 F.3d 417, 427 (6th Cir. 2002).

believe that the Commonwealth is officially endorsing a particular type of bourbon or artwork because Maker's Mark or Hotel 21C received the tax rebate.[10]

"This Court has long recognized that the government may ... accommodate religious practices ... without violating the Establishment Clause." *Cutter*, 544 U.S. at 713 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 144-145 (1987)) (internal quotation marks omitted). As Defendants themselves point out, "there is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Id*. at 713-14 (quoting *Locke v. Davey,* 540 U.S. 712, 718 (2004) (internal quotation marks omitted)); *Walz,* 397 U.S. at 669. Thus far AiG is the only group that has applied for the benefit that also has overt religious affiliations and a religious component to its proposed tourist attraction. If AiG meets all the neutral criteria of the program but is excluded solely because of its religious affiliation, message, or beliefs, then the KTDA is not being applied neutrally. Conversely, the neutral and equal application of the Act's criteria for qualifying projects "confers no privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment." *Cutter*, 544 U.S. at 724 (finding law did not violate Establishment Clause when it did not give special treatment to particular religious sect over others). Thus, the Court concludes that "the evenhanded language of the program, the religion-neutral purposes behind the program," and the "wide array of entities . . . [both] secular and religious" that have participated in the program "foreclose any claim that the program was implemented with the purpose of advancing religion." *Am. Atheists*, 567 F.3d at 291.

---

[10] As an aside, the Court notes that Justice Scalia has commented on the "oddity" that violations of the Establishment Clause could turn on "the *misperception* of an imaginary observer." *McCreary County,* 545 U.S. at 901 (SCALIA, J., dissenting) (emphasis in original); *see also Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S. Ct. 12, 20 (2011).

**b**

Under the second prong of the *Lemon* test, as revised by *Agostini*, the government

program at issue does not have the primary effect of either advancing or inhibiting religion "if it:

(1) does not result in government indoctrination of religion; (2) does not define its recipients by

reference to religion; or (3) create an excessive government entanglement with religion."

*Johnson*, 241 F.3d at 513. First, a government program could have the "primary effect" of

advancing religion "if it leads to religious indoctrination that could reasonably be attributed to

government action." *Am. Atheists*, 567 F.3d at 291 (quoting *Mitchell v. Helms,* 530 U.S. 793,

809, (2000)) (plurality opinion) (internal quotation marks omitted); *see also Agostini*, 521 U.S. at

223 ("government inculcation of religious beliefs has the impermissible effect of advancing

religion"). Despite Defendants' concern that AiG's religious message could be attributed to the

Commonwealth, as long as the Commonwealth provides the KTDA incentives "to religious and

secular entities alike" and "allocat[es] the benefits based on criteria that have nothing to do with

religion," the Commonwealth would adequately demonstrate that it "neither endorsed nor

approved of [AiG]'s religious teachings." *Am. Atheists*, 567 F.3d at 291. No government

indoctrination occurs if "the government, seeking to further some legitimate secular purpose,

offers aid on the same terms, without regard to religion, to all who adequately further that

purpose [.]" *Johnson*, 241 F.3d at 513 (quoting *Mitchell*, 530 U.S. at 809).

The concern about indoctrination is not a question of whether the entity receiving the

benefit engages in some kind of religious instruction as much as it is a question of whether such

religious indoctrination "could reasonably be attributed to governmental action." *Johnson*, 241

F.3d at 513 (quoting *Mitchell*, 530 U.S. at 809). As noted above, in determining the purpose

attributed to the government, the principle of neutrality is of great importance, in the sense of

"upholding aid that is offered to a broad range of groups or persons without regard to their religion." *Mitchell*, 530 U.S. at 809.

> If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government. For attribution of indoctrination is a relative question. If the government is offering assistance to recipients who provide, so to speak, a broad range of indoctrination, the government itself is not thought responsible for any particular indoctrination. To put the point differently, if the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, *see Allen,* 392 U.S., at 245–247 (discussing dual secular and religious purposes of religious schools), then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose. The government, in crafting such an aid program, has had to conclude that a given level of aid is necessary to further that purpose among secular recipients and has provided no more than that same level to religious recipients.

*Mitchell*, 530 U.S. at 809-10.  Here, as explained above, the KTDA is designed to further a legitimate secular purpose, and its language and criteria offer the potential rebate to all without regard to religion.  Thus, if AiG or some other religiously affiliated entity qualifies for and receives the rebate, the aid still has the effect of furthering the original secular purpose.  As long as AiG is treated equally along with secular recipients, any religious indoctrination or speech that takes place at the Ark Park will not be attributed to the Commonwealth.[11]

As recently articulated by the Sixth Circuit, in considering whether the relationship between the government entity and AiG has the primary effect of advancing religion, courts also consider "whether the action [at issue] conveyed an objective message that the government was endorsing religion."  *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 589 (6th Cir.

---

[11] In the context of aid to private schools, the Supreme Court has noted the importance of private choice determining the distribution of aid because it is one way to prevent the attribution of indoctrination to state decision-making.  *See Mitchell*, 530 U.S. at 810-11; *Agostini*, 521 U.S. at 231-32.  Although the case at hand has several notable factual distinctions from cases involving aid to religious schools, there still is an element of private choice involved because the revenue that AiG will receive, the basis of which will determine the amount of any potential rebate, is ultimately determined by the private choices of individuals who choose to attend the theme park.  Moreover, in the context of distinguishing between direct and indirect aid, the Supreme Court has noted that "[a]lthough the presence of private choice is easier to see when aid literally passes through the hands of individuals . . . there is no reason why the Establishment Clause requires such a form."  *Mitchell*, 530 U.S. at 815-16.

2015) (citing *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).  What is sometimes referred to as the "endorsement test" considers whether the state "coerces participation in a religious activity.  Coercion not only includes securing participation through rules and threats of punishments but also includes imposing public pressure, or peer pressure, on individuals." *Id.* (citing cases involving school prayer).  Although this issue frequently arises in the context of prayer or religious ceremonies on government-owned property, certain uses of private property for government-sponsored functions can be considered coercive if the function is held in a religious environment and attendance is not truly voluntary.  *Smith*, 788 F.3d at 592.  In such cases, "[t]he government violates the endorsement test if a reasonable observer would think that the activity is a governmental endorsement of religion." *Id.* at 590 (citations omitted).  However, when a non-governmental entity is responsible for the religious references conveyed to observers, and the purpose of the arrangement between that entity and the government entity is purely secular, the religious message is incidental to the relationship between the government and the entity receiving the benefit, and therefore the reasonable observer will view the religious message very differently than if it were conveyed by a governmental entity itself or on government-owned property.  *See Smith*, 788 F.3d at 592.

Here, allowing AiG to participate in the KTDA program does not compel or coerce anyone to participate in any religious ceremony.  AiG confirms that no visitor to the park will be forced to accept any views or interpretation presented there.  [R. 1, ¶ 160.]  If activities such as prayer or evangelization take place at the Ark Park, anyone present will be free to leave or choose not to participate.  The visitors attending the park will do so voluntarily and be able to leave whenever they want.  Such a situation, therefore, is distinguishable from that in *Teen Ranch v. Udow* and several other cases relied upon by the Commonwealth where the court

26

focused on the age and situation of children or teenagers in schools and other educational institutions. *See* 389 F.Supp.2d 827 (W.D. Mich. 2005), *aff'd*, 479 F.3d 403 (6th Cir. 2007) (emphasizing the impressionable minds of teenagers living at the ranch who could not fully avoid all pressure to participate). Here, unlike children in school, visitors are choosing to pay money to attend a theme park and can complain to the park's operators or choose not to come back if they dislike the message presented. Regardless of its religious theme, the Ark project is still a business, and as such involves a customer service aspect that will limit the possibility of forced indoctrination. Any concern of possible coercion such that a reasonable observer would think the government was conveying the religious message presented by AiG is unfounded.

As for the second factor of the primary effect prong, when considering whether the government program defines its potential recipients by reference to their religion, the court must determine whether the "criteria for allocating the aid create a financial incentive to undertake religious indoctrination." *Johnson*, 241 F.3d at 514 (quoting *Mitchell*, 530 U.S. at 813). In the case at hand, there is certainly no incentive for potential recipients to undertake religious indoctrination.[12] On the contrary, it is because of AiG's religious message that AiG is being denied the benefit. When a government program is "made available without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited," it does not provide an impermissible incentive and likely will not violate the Establishment Clause even when it provides a benefit to religious institutions. *Id*. (quoting *Witters*, 474 U.S. at 488); *see also Agostini*, 521 U.S. at 231 (an improper incentive is "not present . . . where the aid is

---

[12] The Sixth Circuit has referenced a related factor of considering whether the program "employs skewed selection criteria that stack the deck in favor of groups that engage in religious indoctrination, encouraging potential recipients to take part in religious activity by rewarding them for doing so." *Am. Atheists*, 567 F.3d at 291. Here, the KTDA employs neutral, evenhanded criteria, and neither party has presented any evidence of rewarding applicants for engaging in religious activity. Another consideration is whether "the benefit itself has an inherently religious content." *Id*. at 292. This factor also is of no concern and the parties do not allege otherwise.

allocated on the basis of neutral, secular criteria that neither favor nor disfavor, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis").

Drawing on Supreme Court precedent, in *American Atheists v. Detroit*, the Sixth Circuit also identified another factor to consider under the primary effect inquiry that is particularly relevant to the Commonwealth's concerns in this case. There, the court noted that a government program could have the primary effect of advancing religion "if the recipient 'divert[s]' secular aid to further its religious mission." *Am. Atheists*, 567 F.3d at 293 (quoting *Mitchell*, 530 U.S. at 840-41, 857). In a factually similar scenario, the city of Detroit created a downtown revitalization program that allocated reimbursement grants funded by property tax revenues to property owners and tenants who made approved renovations to their buildings and parking lots. 567 F.3d at 282. Of the 91 approved and completed projects, nine involved reimbursements made to three churches, while the other projects involved a wide range of secular businesses such as banks, hotels, a theater, and an apartment building. *Id*. at 284. A non-profit organization called American Atheists argued that the tax-funded reimbursements to the three churches violated the Establishment Clause. The Sixth Circuit, however, found that the program did not have the impermissible effect of advancing religion nor would a reasonable observer believe the government was endorsing the churches' religious viewpoints.

In *American Atheists*, the court found that diversion was not a concern because much of the aid consisted of reimbursements for cosmetic repairs to buildings and parking lots. 567 F.3d at 293. The court came to this conclusion despite the fact that although the reimbursements were for particular items, such aid necessarily freed up other funds for the churches to use in ways that furthered their mission. *Id*. The court noted that "[t]he Supreme Court has repeatedly rejected the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it

to spend its other resources on religious ends." *Am. Atheists*, 567 F.3d at 296 (quoting *Hunt*, 413 U.S. at 743) (internal quotation marks omitted). Thus, despite the Commonwealth's implication that AiG "cannot lawfully receive public funds for its operations" because of its religious identity [R. 24 at 27; R. 18-1 at 26], the Establishment Clause does not *per se* bar every kind of government aid to all religious organizations.

As the Sixth Circuit reasoned in *American Atheists*, the government provides other tax-funded benefits to churches and religious non-profits such as sewers, sidewalks, police and fire-protection services, and even tax exemptions all without violating the Establishment Clause, and such benefits all "facilitate the operation of the religious institution, either by saving them money directly or by sparing them the expense of providing the services on their own." 567 F.3d at 291; *see also Widmar v. Vincent*, 454 U.S. 263, 274-75 ("If the Establishment Clause barred the extension of general benefits to religious groups, a church could not be protected by the police and fire departments.") (internal quotation and quotation marks omitted). Both the Sixth Circuit and Supreme Court have upheld such benefits, in addition to indirect benefits to religious schools such as school-bus services, books, and technology. *Id*. at 291-92 (collecting cases); *see also Agostini*, 521 U.S. 203, 225.

Because money is fungible, such benefits will to some extent have the incidental effect of allowing the institution's other funds to be used to advance their religious purposes if they wish. Indeed any reimbursement, aid, or tax exemption necessarily frees up other funds for other purposes. Indirect benefits, however, do not have the primary effect of advancing religion. *See Johnson,* 241 F.3d at 510 ("The Supreme Court has consistently rejected the argument that any and all government aid to a religiously affiliated institution violates the Establishment Clause.") (collecting cases); *Widmar*, 454 U.S. at 273-74 ("a religious organization's enjoyment of merely

29

'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion") (collecting cases); *Mueller*, 463 U.S. at 398-99 (noting that "a program . . . that neutrally provides state assistance to a broad range of citizens is not readily subject to challenge under the Establishment Clause").

Thus, it is not true that no tax dollars can ever benefit a religious institution without creating an impermissible establishment of religion.  The question is whether the government "provides the same benefit to all [similarly situated entities] on the same terms."  *American Atheists*, 567 F.3d at 292; *see also Zobrest*, 509 U.S. at 8 ("[W]e have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit").  This principle applies even more clearly in the situation at hand because any rebate AiG receives will have been generated by AiG in the first place, and therefore such a benefit seems even less likely to be attributed to government endorsement of AiG's religious views than the incidental benefits described above to religious schools and churches.  As in *American Atheists*, the KTDA program's "breadth, evenhandedness, and eminently secular objectives help to break the link between government and religious indoctrination," and when AiG or any other religiously affiliated organization participates in the program "alongside and on equal terms with dozens of secular entities," no reasonable observer would think the government was endorsing their religious views.[13]  *Id*. at 292.

---

[13] Indeed, as the Sixth Circuit warned in *American Atheists*, "[e]xcluding the churches from taking part in the program, by contrast, would send a far stronger message -- a message not of endorsement but of disapproval," while including churches in a neutral program "to avoid sending a message of hostility to people of faith" is permissible under the First Amendment.  567 F.3d at 292.

Moreover, the cases to which Defendants cite in support of their concern about diversion of aid focus on the evidence or lack thereof that a recipient actually used government funding for religious indoctrination.  *See, e.g., Am. Atheists*, 567 F.3d at 293; *Mitchell*, 530 U.S. at 840; *Bd. of Educ. of Central Sch. Dist. No. 1 v. Allen*, 392 U.S. 236 (1968).  Here, however, the record does not provide definitive evidence as to how AiG will use the tax rebate.[14]  Even if it did, as explained in *American Atheists*, as long as the benefit is offered on "religion-neutral terms to a wide spectrum of speakers," the "broad sweep of the program" will "alleviate[]" the impression that the government endorses the message of any one participant.  567 F.3d at 293.  Indeed, creating a situation in which the state determines that one expenditure is "too religious" and another is not could present concerns with excessive entanglement, as further discussed below.[15]

A related concern in *American Atheists* was the question of whether a reasonable observer could attribute a religious message to the city because of the reimbursement for church signs that could be used to display a variety of religious messages.  567 F.3d at 293.  Despite the specific use of the reimbursement for a religious message, the Sixth Circuit found that when the government "subsidizes a medium of communication on religion-neutral terms to a wide spectrum of speakers, the Establishment Clause does not bar a private group from using a government-provided medium to espouse its own message, even a religious message."  *Id*. at 293-94 ("So long as Detroit provides the same support to every other speaker, no reasonable observer could attribute a religious message to the City any more than he could attribute

---

[14] Indeed this concern is somewhat speculative since AiG has not yet received a rebate and since the amount of the rebate is dependent on the sales AiG generates in the future.

[15] The Court notes that in response to the Commonwealth's concerns, the board of directors for both AE and Crosswater Canyon have submitted resolutions directing AE to limit the use of the KTDA rebate funds to reimburse only a specified list of expenditures such as landscaping, parking lots, restroom facilities, and "other capital expenditures not directly related to religious-themed displays, exhibits or messaging."  [R. 36-1, R. 36-2.]  The Court's conclusion in this matter is not based on such resolutions, but their existence in the record should at least mitigate the Commonwealth's unfounded concerns about diversion.

messages conveyed by other downtown signs to the City.") (collecting cases). "When the government endorses everything, it endorses nothing." *Id.* Here, the Commonwealth is not specifically giving money to further AiG's message any more than it is supporting the messages of the other program participants.

**c**

Finally, concerning the third prong of the *Lemon* test, which has been incorporated into the third prong of the revised primary effect test, courts must consider whether the government program or action at issue creates an excessive government entanglement with religion. *Mitchell*, 530 U.S. at 807-08; *Johnson*, 241 F.3d at 513. As the Supreme Court has noted, "[i]nteraction between church and state is inevitable, and we have always tolerated some level of involvement between the two." *Agostini,* 521 U.S. at 233 (internal citations omitted). Any entanglement must be "excessive" before it violates Establishment Clause principles. *Id.* To determine if there is excessive entanglement, the Supreme Court has directed courts to consider "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Agostini*, 521 U.S. at 232; *see also Johnson*, 241 F.3d at 515. Impermissible entanglement would involve an ongoing relationship of monitoring AiG's actions, speech, viewpoints, and hiring practices. *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 594 (6th Cir. 2015) (explaining that "entanglement has arisen when the nature of the relationship requires comprehensive, discriminating, and continuing state surveillance to ensure that state funds were not being used for improper purposes") (quoting *Lemon,* 403 U.S. at 625) (internal quotation marks omitted).[16]

---

[16] Excessive entanglement may also arise "when essential governmental functions are delegated to religious entities," such as "a law giving religious entities veto power over applications for liquor licenses," or "giving a

Quite simply, under the standard set forth in *Agostini*, the Commonwealth has not demonstrated how allowing AiG to participate in the tourism program constitutes impermissible entanglement.  The character of AiG's proposed project is undoubtedly religious in nature, and its purpose includes informing people of its religious views.  However, it is also a for-profit business and entertainment facility with an undeniable effect of generating revenue for the Commonwealth.  [*See* R. 15-21.]  It is also important to remember what the Ark project is not.  As discussed further below, it is not a church, nor is it a religious non-profit enjoying a tax exemption, nor is it a religious school.  Under the KTDA's definition, the Ark project is a tourist attraction that will promote the Act's secular goals.  [*See* 15-21.]

As for the nature of the aid at issue, AiG could potentially receive a tax rebate determined by the total amount of sales generated, but the rebate is not a designated amount of the Commonwealth's budget, nor is it direct government aid that requires continual monitoring by the Commonwealth.[17]  While it is true that AiG's participation in the program could "arguably confer[] a benefit on it that it could [use] for religious purposes, this potential benefit, without more, is never sufficient to establish an Establishment Clause violation."  *Smith*, 788 F.3d at 593 (citing *Johnson*, 241 F.3d at 515).

Finally, concerning the relationship between the Commonwealth and AiG, if the Commonwealth simply allows AiG to participate in the program on the same footing as all other applicants and applies the criteria in a neutral, even-handed way, there is no resulting relationship that is any different from the Commonwealth's relationship with the secular

---

religiously defined community control over a local school board."  *Smith*, 788 F.3d at 594 (citing *Larkin*, 459 U.S. at 116 and *Bd. of Ed. Of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994)).  Clearly, no such improper delegation is at issue in the case at hand and the parties have not alleged otherwise.

[17] Even if it did, the appropriate test would be whether it was given in a neutral manner, which, as discussed above, the KTDA as written sufficiently provides for neutrality and nothing about the program indicates a religious preference on the part of the Commonwealth.  *See Smith*, 788 F.3d at 593.

applicants.  In other words, the resulting relationship would consist of reviewing AiG's application, ensuring that AiG continues to meet the neutral criteria in the Act, and then issuing a tax rebate at some point if and when AiG generates a sufficient amount of sales.  As in *Smith*, the administration of the KTDA program will "not require significant monitoring" if the Commonwealth consistently administers it "in a secular manner."  *Id*.  On the other hand, however, if the Commonwealth examines each applicant's message and viewpoint to determine if they are religious, and if so, how religious, and then uses that information to approve or deny their application, the government will involve itself in an impermissible form of entanglement.

Monitoring and inspection by government officials "in a pervasively secular environment" in order "to ensure the absence of a religious message … infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement."  *Agostini*, 521 U.S. at 221-22 (quoting *Aguilar v. Felton*, 473 U.S. 402, 412-13 (1985), overruled on other grounds).  Thus, excluding applicants from participation in the KTDA's facially neutral program because a proposed project's evangelical nature constitutes impermissible entanglement because it requires the government to examine the religious beliefs of the applicants to see if they are "too religious."  Here, the Tourism Cabinet scoured AiG's website, analyzed press releases and statements made in press conferences, and, in response to a letter from an outside organization, reviewed job postings to order to analyze AiG's religious beliefs.  [R. 1, ¶¶ 155-56, 182-83; R. 15-8; R. 15-18; R. 24 at 13-14.]

Although the Cabinet initially approved the project while being fully aware that it focused on the Biblical account of Noah's Ark, after conducting outside research the Cabinet denied AiG's second application based on concern over the project's "evangelical ministry" and Christian Gospel message.  [R. 15-8; R. 15-17; R. 15-23.]  The very nature of Secretary

Stewart's letter rejecting the second application illustrates the problems of entanglement in his references to press conferences that made the project seem more evangelical than he had previously understood it to be. [R. 15-23.] Stewart's letter stated that the project's religious nature represented "a substantial change in position" from the first approval in 2011, yet AiG has been clear about the project's religious purpose from its inception.[18] [R. 15-23.] The Commonwealth's emphasis on the Christ the Door Theater exhibit as being the major change from the 2011 plan further illustrates the entanglement that arises when government analyzes whether a message is "too evangelical" or "too Christian." This manner of analyzing the content of religious message and purpose in order to exclude applicants from an otherwise secular program with neutral criteria constitutes impermissible entanglement and is itself a violation of the First Amendment.[19] "The Establishment Clause requires neutrality toward religion, not hostility." *Am. Atheists*, 567 F.3d at 297.

In conclusion, the KTDA has a secular legislative purpose, and neither the Act itself nor allowing AiG's participation in the program gives rise to an endorsement of religion, nor do they have the primary effect of advancing religion, nor do they involve an excessive entanglement between the Commonwealth and religion. As the Sixth Circuit found with regard to the reimbursement program in *American Atheists*, if the Commonwealth applies the KTDA's facially

---

[18] Moreover, although Defendants maintain that the project's religious nature "evolved" from the time of the first application to the second, this contention appears somewhat disingenuous since the 2010 press conference with Governor Beshear made it clear that the Ark project was going to encompass "a Gospel message" and that AiG viewed the project as part of its religious mission. [R. 1, ¶¶ 112-14.]

[19] Concerning Defendants' other arguments regarding entanglement, as explained above, there is no evidence that AiG would use the tax rebate to directly promote a religious message, and even if that were true, Defendants do not demonstrate how that would excessively entangle the Commonwealth under the standard set forth in *Agostini* described above. Defendants also do not show how AiG's hiring practices would excessively entangle the state government since the Commonwealth would only be issuing a tax rebate under a secular, neutral program and would not be involved in nor have oversight over AiG's hiring decisions or employees. To the extent they relate to AiG's free speech claim, both AiG's message and hiring practices are further discussed below.

neutral criteria "to a wide spectrum of religious, nonreligious and areligious groups alike," there

is no Establishment concern.[20] *Am. Atheists*, 567 F.3d at 290 (finding the inclusion rather than

exclusion of several churches in the program "helps ensure neutrality, not threaten it").

However, excluding AiG from the program because of its religious beliefs violates the crucial

First Amendment principle of neutrality and leads to improper government entanglement with

religion because it requires state officials to critique and scrutinize applicants' beliefs and adds

an unwritten requirement to the KTDA that participants be secular or at least not "too religious."

## 2

AiG claims that the Commonwealth's exclusion of AiG from the program because of its

religious views and message violates the Free Exercise Clause of the Constitution, specifically

by interfering with their rights to free speech and free association.  The Free Exercise Clause

"protects not only the right to hold a particular religious belief, but also the right to engage in

conduct motivated by that belief." *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 427 (6th Cir.

2002) (internal quotation omitted).  This freedom means that "[g]overnment may neither compel

affirmation of a repugnant belief. . . nor penalize or discriminate against individuals or groups

because they hold religious views abhorrent to the authorities. . . nor employ the taxing power to

inhibit the dissemination of particular religious views." *Sherbert v. Verner*, 374 U.S. 398, 402

(1963) (internal citations omitted).  When a government entity seeks to regulate or inhibit

---

[20] Interestingly, the Tourism Cabinet itself has recognized on at least one occasion in 2011 that there is no Establishment issue with the KTDA or with AiG's participation in the tourism program.  In an e-mail from the Director of Communications for the Cabinet, the program was described as follows:

> The incentive evaluation does not discriminate based on the entertainment subject matter so long as it is legal, and there is no legal prohibition of the type of entertainment Ark Encounter seeks to provide.  Federal law is quite clear – faith-based organizations may apply for government funded incentive programs as long as the incentive was not created solely for that organization, and that the process is open to all applicants.

[R. 38-1.]

conduct based on religious beliefs, the government must show that "any incidental burden" on free exercise is "justified by a compelling state interest in the regulation of a subject within the State's constitutional power to regulate." *Id*. at 403 (internal citation and quotation marks omitted).[21]  When a plaintiff claims that the government has violated his rights under the Free Exercise Clause, "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *S. Ridge Baptist Church v. Indus. Comm'n of Ohio*, 911 F.2d 1203, 1207 (6th Cir. 1990) (quoting *United States v. Lee*, 455 U.S. 252, 257-58 (1982)).

The Sixth Circuit has further clarified this standard by identifying three factors courts must weigh in determining whether government action "impermissibly burdens individual rights under the free exercise clause": (1) "the magnitude of the burden on defendant's exercise of religion"; (2) "the existence of a compelling state interest justifying the burden"; and (3) "the extent to which accommodation of the defendant would impede the state's objectives." *S. Ridge Baptist Church*, 911 F.2d at 1206.  Just because some burden is placed on an individual's religious practice does not necessarily violate the Free Exercise Clause as long as the government can justify its action "by showing that it is the least restrictive means of achieving a compelling state interest." *Id.* (quoting *Thomas v. Review Board, Indiana Employment Security Division,* 450 U.S. 707, 718 (1981) and *Lee,* 455 U.S. at 257-58) (internal quotation marks omitted)).  "Whether the state has made this showing depends on a comparison of the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *Id.* (quoting *Schmucker,*

---

[21] The Court acknowledges that the balancing test in *Sherbert* is no longer applicable in cases where an individual seeks an exemption from civic obligations or from obeying an otherwise generally applicable law because of the individual's religious beliefs, but such is not the case here.  *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751, 2760-61 (2014) (citing *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997)).

815 F.2d at 417) (internal quotation marks omitted).  Therefore, we must determine first if there is an infringement on AiG's free exercise, and then whether the Commonwealth has met its burden of showing that such infringement is justified by a compelling state interest.

Here, Defendants argue that excluding AiG from the program is not a substantial infringement since the Commonwealth is not preventing AiG from building the park nor prohibiting AiG from expressing its religious beliefs.  [R. 18-1 at 38-41.]  This argument, however, fails because the issue is not only the extent of the infringement, but also the nature of the infringement.  If the purpose or effect of the government action at issue "is to impede the observance of one or all religions or is to discriminate invidiously between religions, [it] is constitutionally invalid even though the burden may be characterized as being only indirect." *Sherbert*, 374 U.S. at 403-04 (explaining that although being declared ineligible for certain government benefits may only be an "indirect result" and no criminal sanctions were imposed, the seriousness of the consequences was "only the beginning, not the end of our inquiry").

In *Sherbert*, the appellant was declared ineligible for government benefits solely because of her religious practices, and although she was not prohibited from continuing to practice her religion, the Supreme Court found that pressuring her to forego a religious practice in order to receive the benefit was an impermissible burden upon her free exercise rights.  *Id*. at 404.  In doing so, the Court rejected the argument that such exclusion was permissible because the government benefit at issue was a "privilege" rather than a "right."  *Id*.  The Court noted several previous cases where it found that "conditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms," and that when the imposition of such conditions "upon even a gratuitous benefit

38

inevitably deterred or discouraged the exercise of First Amendment rights of expression," such conditions were constitutionally invalid.  *Id*. at 405.

Similarly, in the case at hand, the Commonwealth admits that it denied AiG's application because of AiG's religious beliefs, evangelical message, and desire to hire those who agree with its religious views.  [R. 15-23.]  Such action is essentially "employ[ing] the taxing power to inhibit the dissemination of particular religious views," which is unconstitutional because it discourages AiG's First Amendment rights of religious expression.  *Sherbert*, 374 U.S. at 402. Therefore, even if AiG is not actually prohibited from expressing its religious views, denying a potential tax benefit because the claimant engages in certain kinds of speech "is in effect to penalize them for such speech."  *Id*. at 405-06 (quoting *Speiser v. Randall*, 357 U.S. 513, 518 (1958)); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (finding that government inhibits free exercise rights when it denies benefits to persons because of their constitutionally protected speech or associations) (collecting cases).

The Commonwealth has forced AiG to choose between expressing its religious views on its own property at the theme park and receiving the tax rebate under the KTDA.  Although Defendants are correct that "the mere non-funding of private secular and religious . . . programs does not burden a person's religion or the free exercise thereof," [R. 18-1 at 38 (quoting *Teen Ranch*, 389 F. Supp.2d at 838)], in this case the Commonwealth is funding the private secular programs while discriminating against the religious one because of its religiosity, which is a violation of the Free Exercise Clause.  A substantial burden exists when "governmental action penalize[s] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."  *Living Water Church of God*, 258 F. App'x at 734 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)).  Here,

because of their religious activity, AiG is being denied an equal share of the benefits and privileges enjoyed by the other applicants.

Second, the Commonwealth has not shown a compelling state interest justifying such infringement.  Defendants contend that the primary "overriding interest" justifying AiG's exclusion was their concern that approving AiG's application would violate the Establishment Clause.  While the Court agrees that the interest of the Commonwealth in avoiding violations of the Establishment Clause is compelling, as explained above, allowing AiG to participate in a tax incentive program with a secular purpose and based on objective criteria will not violate the Establishment Clause.  *See Widmar*, 454 U.S. at 271.  On the contrary, it is AiG's exclusion from the program based on their religious beliefs that violates the First Amendment.  Thus, the alleged state interest does not justify the violation of AiG's rights under the Free Exercise Clause.[22]

Third, accommodating AiG by allowing it to participate in the tourism program without restricting its religious message, and while also taking advantage of the exception concerning its hiring practices to which it is entitled, would not impede the state's objectives.  As explained above, the government purposes outlined in the KTDA are to promote tourism and improve the state's overall economy through jobs and commerce.  Ky. Rev. Stat. § 148.853.  Ironically, such goals would best be met by allowing AiG's participation in the program, as demonstrated by the Hunden Report, which concluded that the project met the definition of a tourist attraction as defined in Ky. Rev. Stat. § 148.851 [R. 15-21], that it would create hundreds of jobs in the surrounding area [*id*. at 8], and that it should have a large positive net economic impact on Kentucky even after subtracting out the expected rebates. [*Id*. at 9-13.]  These are all legitimate

---

[22] To the extent that Defendants contend a lower standard such as rational basis review should be used instead, because AiG's participation would not violate the Establishment Clause, Defendants' stated interest in avoiding such violation would not pass rational basis review.

interests for the Commonwealth, and allowing AiG's participation would further such interests rather than impede them.  The only interest the Commonwealth asserts would be impeded is that of avoiding an Establishment Clause violation, but because of the First Amendment violation in excluding AiG, allowing AiG's participation would actually further that interest.

Therefore, the Commonwealth's pressure for AiG to give up its religious beliefs, purpose, or practice in order to receive a government benefit and gain acceptance into a government program impermissibly burdens AiG's free exercise of religion.  *See Living Water Church of God*, 258 F. App'x at 734; *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981) (noting that where the state conditions receipt of a benefit or denies a benefit based upon conduct mandated by religious belief, thus putting "substantial pressure on an adherent to modify his behavior" in a way that violates his religious beliefs, "a burden upon religion" and an infringement upon free exercise exist).  Despite having a facially neutral law with secular criteria, the Commonwealth is engaging in disparate treatment by allocating benefits based on distinctions among religious and non-religious groups.  Thus, not only has AiG stated a plausible claim for a violation of its free exercise rights, but the Court also finds that AiG is likely to succeed on the merits of that claim.

**3**

An integrally related issue is whether the Commonwealth's actions violate AiG's freedom of speech through unconstitutional viewpoint discrimination.  According to AiG, the Commonwealth's first stated reason for denying their application -- that of AiG's religious purpose and mission -- violates their free speech rights because they are being excluded based on their intent to express their religious viewpoint, and the Commonwealth's second stated reason

violates AiG's freedom of association by denying them the benefit of the KTDA unless AiG chooses to forego its right to hire people who agree with its religious beliefs.

a

The Supreme Court has "required the most exacting scrutiny in cases in which a State undertakes to regulate speech on the basis of its content." *Widmar*, 454 U.S. at 276. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citation omitted). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828 (citation omitted). Viewpoint discrimination is an "egregious form of content discrimination" because when the government targets "particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829.

Here, the Commonwealth clearly targeted AiG's religious views and excluded AiG from participation in a government program because of its religious message. Nevertheless, the Commonwealth contends that viewpoint discrimination is not at issue because the KTDA did not create a forum for speech. [R. 24 at 28-31; R. 18-1 at 34-35.] The Commonwealth, however, overlooks the distinction between situations in which the government directly subsidizes certain entities or chooses among certain programs in order to fulfill a government objective, and situations in which the government offers an incentive program that invites any and all qualified private participants.

First, the state can create a forum for speech through setting up certain government programs even if it does not specifically state an intent to do so. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-43 (2001) (determining that a government program providing legal assistance to indigents created a forum for speech). Thus, even if a program's stated purpose "is

42

not to encourage a diversity of views, the salient point is that, like the program in *Rosenberger*, the [government] program [at issue] [is] designed to facilitate private speech, not to promote a government message." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (quoting *Rosenberger*, 515 U.S. at 834).

Second, when the government subsidizes particular private entities to fulfill a government function, as it did in *Rust v. Sullivan*, 500 U.S. 173 (1991), or when the state selects among certain programs to support financially, as it did in *Locke v. Davey*, 540 U.S. 712 (2004), the government engages in a form of its own speech that can be directly attributable to the state, and therefore may regulate it in certain ways. The Commonwealth is correct that when the government provides public funds to private entities for the purpose of conveying a governmental message, the government can make certain "viewpoint-based funding decisions," and impose certain restrictions on the speech at issue. *Velazquez*, 531 U.S. at 541 (internal citations and quotation marks omitted). However, such is not the case here. Here, the speech at issue is private speech and not government speech.[23]

In the realm of private speech, "government regulation may not favor one speaker over another." *Rosenberger*, 515 U.S. at 828 (citations omitted). Additionally, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. at 829. Here, the Commonwealth seeks to deny a benefit because the Ark project includes an evangelistic message. Such religious messaging, however, is protected speech. *See, e.g., Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) ("The right to free speech ... includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience.") (quoting *Hill v. Colorado*,

---

[23] The cases the Commonwealth relies upon primarily involve government speech.

530 U.S. 703, 716 (2000)); *see also Heffron v. Int'l Soc'y for Krishna Consciousness,* 452 U.S. 640, 647 (1981) (holding that written and oral dissemination of religious viewpoint are protected speech); *McGlone v. Bell*, 681 F.3d 718, 731-32 (6th Cir. 2012) (finding that sharing religious message "through public speaking, . . . distribution of literature, and display of signs is protected First Amendment activity"). The Ark project does not involve government property, and the program at issue does not involve a subsidy to fulfill government functions or relay a government message. The KTDA created an incentive program open to a broad spectrum of all qualified participants regardless of religion, and the government is not permitted to restrict the messaging of those participants without a compelling reason to do so. *See, e.g., Widmar*, 454 U.S. at 276-77 (rejecting university's concern that creating a religious forum would violate the Establishment Clause when the forum was "available to a broad class of nonreligious as well as religious speakers" because "[t]he provision of benefits to so broad a spectrum of groups is an important index of secular effect.").

Moreover, each tourist attraction must engage in some kind of messaging and expression of beliefs and opinions in order to attract tourists. Indeed, it is AiG's viewpoint and the message about Noah's Ark that will be part of the attraction generating revenue for AiG and resulting in tourists visiting the Park, and by extension, Kentucky. Yet because the participants are not engaging in government speech, the Commonwealth need not worry that their various messages will be attributed to the state government. "[W]hen the State is the speaker, it may make content-based choices" concerning the message presented, but no one will attribute the messages about Buffalo Trace distillery, the 21C Museum hotel, or the rides at Kentucky Kingdom to Kentucky's government. *Rosenberger*, 515 U.S. at 833. To say that no forum is involved in this case or that the state did not intend to create a forum through the KTDA, and therefore is free to

discriminate against various applicants based on their message, overlooks the nature of the freedom the First Amendment is designed to protect.

When a state creates a public forum, it may be justified in confining the forum and the discussion of topics therein to the limited purposes for which it was created, but even then the "State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum . . . nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger*, 515 U.S. at 829 (quotation and internal quotation marks omitted).[24]  Here, from the facts presented in the record, the Commonwealth clearly knew about AiG's religious affiliation and mission even before the first application was approved.  It appears that Defendants became more concerned about AiG's religious message after they learned more about its evangelical nature and that references to Jesus would be included rather than just the story of Noah's Ark. [R. 15-8; R. 15-23.]  Despite Defendants' protests to the contrary, the reasons given for denying AiG's second application indicate that the Commonwealth decided AiG's message was "too religious" or "too evangelical."  [*Id.*]  The Supreme Court recently cautioned that the "[g]overnment may not mandate a civic religion that stifles any but the most generic reference to the sacred any more than it may prescribe a religious orthodoxy."  *Town of Greece, NY*, 134 S.Ct. at 1822 (noting the difficulty of separating sectarian from nonsectarian speech and warning that concern for neutrality should not lead to "a brooding and pervasive devotion to the secular") (quoting *Schempp*, 374 U.S. at 306)).  "The First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech."  *Id.* at 1822.

---

[24] The parties dedicate several pages of their respective briefs to the question of whether the Commonwealth created a limited public forum through the Tourism Act.  Regardless of whether a particular kind of forum was created, the government still cannot impermissibly restrict religious speech.  Just because private property rather than government property is at issue does not moot any potential free speech claim.  Moreover, the Court need not address extensively the parties' arguments concerning the type of forum because there is a clear violation of AiG's rights under the Free Exercise Clause if government benefits are being withheld because of their religious message.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 816 (2000). Defendants have not met that burden. As in *Widmar*, the Commonweath's asserted interest here -- that of "achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution -- is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well." *Widmar*, 454 U.S. at 276-77. Having created a program generally open to all qualified applicants, the Commonwealth now seeks "to enforce a content-based exclusion of religious speech" which "violates the fundamental principle that a state regulation of speech should be content-neutral." *Id*. at 278.

**b**

AiG also argues that their exclusion from the KTD program infringes on its First Amendment freedom of association, because the Commonwealth's second stated reason for denying the application was AiG's intention to exercise a religious preference in hiring for certain key positions. [R. 15-1 at 30-31.] According to Plaintiffs, AiG qualifies for an exception within Title VII for religious organizations that allows them to give employment preference to those who agree with their own religious views, and the Commonwealth's imposition of an additional requirement not found in the KTD Act requiring AiG to not discriminate in hiring based on religious viewpoints impermissibly interferes with this right. [*Id*. at 31-35.]

Title VII of the Civil Rights Act prohibits employers from discriminating against individuals because of "race, color, religion, sex or national origin. . . ." 42 U.S.C. § 2000e-2(a). In order to protect the constitutional rights of religious organizations, however, Title VII "has expressly exempted religious organizations from the prohibition against discrimination on the

basis of religion." *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618, 623 (6th Cir.

2000).  That exception reads as follows:

> This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a).  "[I]n order to invoke the exception, an employer need not be a

traditional religious organization such as a church, diocese, or synagogue, or an entity operated

by a traditional religious organization."  *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d

829, 834 (6th Cir. 2015) (internal citations and quotation marks omitted).  The institution must

be a "religiously affiliated entity . . . whose mission is marked by clear or obvious religious

characteristics."  *Id.* (internal citations and quotation marks omitted).  The applicability of this

exception does not need to be tied to an actual church or a particular denominational faith but

"applies to multidenominational and nondenominational religious organizations as well."  *Id.*

Here, AiG is clearly a religious organization with a particular religious mission.  The

Commonwealth does not present any reason why AiG would not qualify for this exception, but

contends that AiG's desire to hire people who adhere to its religious beliefs "shows that AiG is a

church on a mission that cannot lawfully receive public funds for its operations."  [R. 24 at 27.]

As explained above, however, the Ark project meets the statutory definition of an entertainment

facility, and its religious mission alone does not bar it from receiving any public funds.

Moreover, nothing in the KTDA mentions adherence to particular hiring practices.  Because AiG

likely qualifies for the ministerial exception under Title VII, it can choose to hire people who

adhere to certain religious beliefs while still being in compliance with state and federal law as

agreed in the application and without their hiring practices being attributed to the

47

Commonwealth.[25]  Nothing further was stipulated to, and to add additional requirements after the fact based on their religious identity risks running afoul of the Free Exercise Clause.

"The freedom to associate protects choices to enter into and maintain certain intimate human relationships as well as associat[ion] for the purpose of engaging in those activities protected by the First Amendment."  *Saieg v. City of Dearborn*, 641 F.3d 727, 741 (6th Cir. 2011) (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18 (1984)) (internal quotation marks omitted).  Unless the government demonstrates that its actions "promote compelling state interests," government action "violate[s] the freedom of association when . . . [it] seek[s] to impose penalties or withhold benefits from individuals because of their membership in a disfavored group; ... [or] try to interfere with the internal organization or affairs of the group."  *Id.* at 741 (internal citations and quotation marks omitted).  Thus, AiG has a right to utilize the exception for religious organizations in Title VII, and in order for the Commonwealth to withhold the benefit of participating in the tourism program because of AiG's religious associations, or to interfere with AiG's internal organization, requires a compelling interest, which Defendants have not presented here.[26]

In conclusion, government policies and action that are not neutral toward religion risk violating the Free Exercise Clause.  *See Church of Lukumi*, 508 U.S. 520, 531-32; *Ward v. Polite*, 667 F.3d 727, 738.  Although the KTDA itself is religiously neutral, the Commonwealth's application of that Act in its exclusion of AiG from the program is aimed

---

[25] To the extent the Commonwealth thinks AiG may have waived its right to use this exemption because of the stipulations about hiring in the first application, the exception for religious organizations in Title VII "is a structural limitation imposed on the government by the Religion Clauses, a limitation that can never be waived."  *Conlon*, 777 F.3d at 836.  AiG's decision to change its intended practices by the time of the second application does not constitute a waiver of its right to qualify for the exception.

[26] Again, the primary justification presented is concern that the Commonwealth will be entangled in AiG's hiring practices, but as explained above, such concern is unfounded, and the manner in which AiG has been excluded from the program constitutes excessive entanglement, not its inclusion despite preferential hiring practices.

specifically at AiG's religious views, and admittedly so since AiG has been excluded "because of, not merely in spite of" its religious viewpoint. *Church of Lukumi*, 508 U.S. at 540. Therefore, the Commonwealth bears the burden of showing that this exclusion is justified by a compelling interest. The Commonwealth's stated interest is its concern that AiG's participation would violate the Establishment Clause, but as explained above, while such an interest is compelling, such concerns in this case are unfounded. Accordingly, the Commonwealth fails to meet its burden, and the Court finds that the exclusion of AiG violates both the Establishment and Free Exercise Clauses of the federal Constitution.[27]

### C

The Commonwealth furthers contend that AiG's claims have no likelihood of success and should be dismissed because allowing AiG's participation in the KTDA program would violate the Kentucky Constitution. According to Defendants, Sections 5, 171, 184, 186 and 189 of the Kentucky Constitution together comprise several antiestablishment provisions that are "not coextensive with the federal First Amendment's Establishment Clause" but are in fact "far more stringent" and together prohibit AiG from participating in the tourism program. [R. 18-1 at 26; R. 24 at 16.] While the Commonwealth is correct that these provisions bar government preferences to religious institutions and require that state tax funds be used for public purposes, the Court finds that these provisions are inapplicable to the case at hand.

### 1

First, Sections 184, 186, and 189 of the Kentucky Constitution do not apply to the instant dispute. Section 184 established a fund for "the purpose of sustaining the system of common

---

[27] Because the Court has found that AiG is likely to succeed on its First Amendment claims, it need not reach the issues concerning the due process and equal protection claims. To the extent these claims must be addressed in the context of the motion to dismiss, the motion will be denied because the Commonwealth's primary support for its motion is based on its insistence that its actions were justified by the Establishment Clause and on its position that no First Amendment violations have occurred, both of which, as explained above, are without merit.

schools," and together with Section 186 they prohibit funds for education being used for any purpose other than for public schools. Ky. Const. §§ 184, 186. Section 189 specifically prohibits any funds or taxes raised for educational purposes from being "appropriated to, or used by, or in aid of, any church, sectarian or denominational school." Ky. Const. § 189. Clearly, these provisions apply to funding for schools and have no application to the KTDA or to the facts of this case. The KTDA does not raise funds or levy taxes and has nothing to do with educational purposes – it offers incentives to businesses and organizations in order to benefit the overall state economy. While it is true that these provisions prohibit the use of tax dollars to fund religious education, the Commonwealth has not shown that the Ark Park is a religious school or other educational institution to which these provisions apply.

   The Commonwealth's only support for the application of these sections is that "AiG emphasizes the teaching purpose of the Ark: to educate the public about 'Biblical truth," apparently implying that a tax rebate to AE could be considered a "portion of any fund or tax now existing," and therefore cannot be given to a "church, sectarian or denominational school." [R. 18-1 at 33; R. 24 at 22.] The Commonwealth, however, has not shown that AiG, Ark Encounter, or the Ark project are schools for purposes of this section. Many organizations, especially tourist attractions, can have a purpose of educating the public about a particular topic without being a school. For instance, the other participants in the KTDA program such as Maker's Mark or Buffalo Trace Distilleries no doubt educate the public about their particular brand of bourbon and the process of making it, yet most people would not consider these distilleries to be schools.[28] Moreover, after discussing Kentucky's 1890 Constitutional debates and explaining the drafters' intentions concerning these particular amendments, the Kentucky

---

[28] Many other nearby tourist attractions "educate" the public about a particular topic – Shaker Village educates people about the Shakers' way of life, visitors to Henry Clay's estate learn about Henry Clay, and the Underground Railroad museum teaches people about slaves escaping to freedom, but these attractions are not considered schools.

Supreme Court noted that the drafters meant the word "school" to be used "in its ordinary sense," such as "a place for systematic instruction in any branch or branches of knowledge," or an institution where "a teacher and pupils . . . gather[] together for instruction in any branch of learning, the arts or the sciences." *Kentucky State Bd. for Elementary and Secondary Ed. v. Rudasill*, 589 S.W.2d 877, 882 (Ky. 1979) (collecting cases) (internal quotation marks omitted); *see also Brimmer v. Commonwealth of Kentucky*, 6 S.W.3d 858, 860 (Ky. 1999) (finding circuit court was correct to analyze "the common dictionary definition of 'school'" when determining that a Montessori learning center was a "school" because its "primary purpose is educational instruction of young children"). Here, it cannot be said that the Ark project, or the other applicants for the tourism program, meet the definition of "school" in its ordinary sense.

Considering the historical context of Section 189 makes it even more inapplicable to a theme park with a religious purpose. *See Univ. of Cumberlands v. Pennybacker*, 308 S.W.3d 668, 676 (Ky. 2010) ("Kentucky constitutional history supports the conclusion that Section 189 was specifically directed at postsecondary or higher education and, further, that the intent was to prohibit all public funding of sectarian or religious colleges.") (citing and analyzing at length the *Official Report of the 1890 Convention*); *see also Rudasill*, 589 S.W.2d at 80-83; *Hackett v. Brooksville Graded Sch. Dist.*, 87 S.W. 792, 792 (1905) ("Section 189 of the Constitution was aimed not to regulate the curriculum of the common schools of the state, but to prevent the appropriation of public money to aid schools maintained by any church or sect of religionists."). Thus, while the Commonwealth contends that AiG seeks to "educate the public" about the Bible, it does not show how a tourist attraction that also has an informative or educational component transforms it into a sectarian school such that Section 189 would apply.[29]

---

[29] The cases relied upon by the Commonwealth in support of this argument all apply to religious schools where the primary purpose is education of enrolled students and do not indicate that Sections 184, 186, or 189 are applicable to

**2**

Section 171 of the Kentucky Constitution mandates that taxes instituted by the General Assembly "shall be levied and collected for public purposes only." Ky. Const. § 171. According to Defendants, the tax rebates under the KTDA come out of state funds because sales taxes collected by retailers are "held in trust . . . for . . . the Commonwealth," Ky. Rev. Stat. § 139.210(3), and once they are remitted to the Revenue Cabinet they become state funds, which can only be used for public purposes. [R. 18-1 at 30-31; R. 24 at 19-20.] Defendants contend that giving AiG a tax rebate would support a religious purpose instead of a public one. [*Id.*]

First, the KTDA does not levy or collect any taxes but instead provides a potential rebate of sales taxes to qualified participants. The money that constitutes the actual amount of the rebate will not have been "levied or collected" for a specific purpose other than to provide the economic incentives under the Act. Unlike the designated appropriations in the cases cited by the Commonwealth, any money applicants receive will have been generated by the program participants themselves through their own sales tax revenue and not collected from other taxpayers. As the Tourism Cabinet itself explained, "[t]he incentive is performance based to the extent the applicant must generate on site sales tax in order to benefit," and "[n]o up front funding is provided by the state." [R. 38-1.] Thus, if AiG does not generate enough in sales, AiG will not receive any rebate under the KTDA. Accordingly, this situation is more analogous to a tax exemption than an appropriation of state funds.

---

the situation at hand. *See, e.g., Pennybacker*, 308 S.W.3d at 679 (invalidating an appropriation to build a pharmacy school on the campus of a Baptist university); *Butler v. United Cerebral Palsy of N. Ky., Inc.*, 352 S.W.2d 203 (Ky. 1961) (invalidating a statute that appropriated state funds to private schools); *Williams v. Bd. of Trustees of Stanton Common School Dist.*, 191 S.W.507 (Ky. 1917) (invalidating arrangement by which the board of education paid tuition fees to a sectarian college for certain students). Here, no statute is appropriating a designated amount of state funds to AiG for educational purposes, and even if it did, the Ark project is not a private school but rather an entertainment venue open to the public who choose to attend it.

Second, regardless of the nature of the funds at issue, "[w]hether money is being used for a public purpose depends on whether the use is a public one and is calculated to aid all the people in the state." *Fannin v. Williams*, 655 S.W.2d 480, 482 (Ky. 1983).  When interpreting the meaning of "public purpose" in Section 171, the Kentucky Supreme Court has held that promoting economic development and relieving unemployment are public purposes "within the purview of the case law and the constitution."  *Hayes v. State Prop. & Bldgs. Comm'n*, 731 S.W.2d 797, 801 (Ky. 1987) (finding that a bill that "expressly declares" the purposes it serves are "public in nature" and states in its preamble that its purpose is "to encourage, promote and support economic development" was a public purpose and did not violate Section 171).  In *Kentucky Bldg. Comm'n v. Effron*, the court found the construction of nonprofit hospital facilities that were owned and run by members of a particular religious denomination was a public purpose, "the test being not who receives the money, but the character of the use for which it is expended."  220 S.W.2d 836, 837 (1949).  "If that use is a public one and is calculated to aid all people in the State," it will not violate the constitution merely because the entity receiving the funds is affiliated with a particular religion.  *Id*. at 838.  Finally, it is the legislature, and not the courts, that has the "primary duty" of determining what is a "public purpose" within the meaning of Section 171.  *Indus. Dev. Authority v. Eastern Kentucky Regional Planning Comm'n*, 332 S.W.2d 274, 276 (Ky. 1960) ("The determination of what constitutes a public purpose is primarily a matter for legislative discretion . . . which is not disturbed by the courts so long as it has a reasonable basis.") (internal citation and quotation marks omitted).

Here, the stated aim of the KTDA is to promote tourism as a means of relieving unemployment and increasing revenue, which are public purposes "in the sense that the state as a whole will receive a benefit" from the program regardless of allowing AiG to participate.  332

S.W.2d at 277.  The tax rebates received by participants in the KTDA are offered for the purpose

of creating incentives for organizations to set up tourist attractions within Kentucky that will

attract tourists from out of state, which will in turn create jobs and promote economic

development.  According to the Hunden Report, even just the first phase of the Ark project will

accomplish those goals. [R. 15-21.]  The Commonwealth contends that giving AiG a rebate

would not benefit all people in Kentucky because "most may not subscribe to AiG's beliefs and

most would be excluded from its hiring criteria." [R. 18-1 at 31-32; R. 24 at 19-21.]  Regardless

of whether "most" people agree with AiG's beliefs, however, the purpose of the KTDA program,

and any tax rebate that AiG receives as part of that program, is to benefit the overall state

economy through promoting tourism, which in turn benefits all people in Kentucky.[30]  *See*

*Hayes*, 731 S.W.2d at 801.  The incentives provided by the KTDA are for a public purpose

regardless of the nature of the program's participants.  *See Effron*, 220 S.W.2d at 837.

    The Commonwealth also points to *Fannin v. Williams*, in which the court determined that

funds specifically designated for providing free textbooks to private schools violated Section 171

because private schools are open to only "selected people in the state," rather than benefiting all

people in the state.  *Fannin*, 655 S.W.2d at 482.  Here, as noted above, however, AiG is not a

private school.  It is an amusement park that is open to all people in the state and outside of the

state.  The KTDA program is also open to all qualified participants.  Moreover, as noted above,

the funds at issue are not designated amounts of the state's budget but come out of sales tax

generated by the program's participants.

---

[30] If the Court were to hold otherwise, then according to Defendants' logic, the rebate received by Maker's Mark would not be for a public purpose unless most people in Kentucky drink Maker's Mark bourbon and agree with its views on making it, and the rebate the 21C Museum Hotel receives would not be for a public purpose unless most of the people in Kentucky go there and appreciate its art.  Similarly, one may question whether most people are qualified to be hired by Maker's Mark or the 21C Museum based on their lack of past experience in the bourbon industry or knowing about art, but that does not mean that the rebates received by those entities violate Section 171.

Finally, contrary to the Commonwealth's assertion, no taxes in this case are being levied for the purpose of financing a religious mission. Sales taxes are levied under the applicable regulations for retailers in the state, and the KTDA was not passed, nor has it been administered, with any purpose of supporting any sectarian group's religious mission or of supporting the Ark Project in particular. In determining whether an appropriation is for a public purpose, "the test is in the end, not in the means." *Indus. Dev. Authority*, 332 S.W.2d at 276. Under such reasoning, the "means" of giving AiG a potential tax rebate if the Ark project generates sufficient funds is not as important as the end which it achieves – i.e., that of attracting tourists to the region and generating revenues for the state, which promotes a public purpose. Moreover, it is not true that state funds can never achieve a public purpose when given to religious organizations with religious missions. *See, e.g.*, *Neal v. Fiscal Ct. of Jeff. Cnty.*, 986 S.W.2d 907, 909-10 (Ky. 1999) (upholding county fiscal court's allocation of funds for transporting children to private and parochial schools because it promoted public purpose of children's safety); *Abernathy v. City of Irvine*, 355 S.W.2d 159, 161 (Ky. 1961) (finding that lease of city-county hospital to a religious order promotes a public purpose); *Effron*, 220 S.W.2d 836, 837 (1949). As explained above, any rebates received by AiG are intended to promote public purposes, and therefore Section 171 does not bar AiG's participation in the KTDA program.

**3**

The Court also finds that Section 5 of the Kentucky Constitution does not bar AiG's participation in the KTDA program. Section 5 states as follows:

> No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges, or capacities of no person shall

be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching.  No human authority shall, in any case whatsoever, control or interfere with the rights of conscience.

Ky. Const. § 5.  First, neither the KTDA program itself nor allowing AiG to participate in it would give any special "preference" to any "religious sect, society or denomination," or to "any particular creed, mode of worship or system of ecclesiastical polity." § 5.  To allow AiG the opportunity to receive the same benefit as all other participants in a facially neutral program does not give a preference to anyone.  The Commonwealth has not shown, nor does the Court find that the caselaw supports, a different meaning for "preference" than what is meant by the federal Establishment Clause.  *See Gingerich v. Commonwealth of Kentucky*, 382 S.W.3d 835, 839 (Ky. 2012) (finding that the free-exercise-of-religion protections in Sections 1 and 5 of the Kentucky Constitution do not offer more protection than the "same or similar section of the federal constitution").  Thus, as explained above, as long as the KTDA is applied evenhandedly to all applicants regardless of their religious beliefs or message, the Commonwealth will not give a preference to any one applicant.  In *Effron*, the court found that appropriations for the construction of a religiously affiliated hospital did not violate the "no preference" clause of Section 5 because the hospital was open to people "of all creeds and faiths – and even to those who profess no certain religious belief ... nor is any one sect given preference over another."  220 S.W.2d at 838.  Similarly, AiG's inclusion on neutral grounds would not give it any special preference because it would not constitute different treatment from the nonsectarian applicants.[31]

---

[31] Despite the Commonwealth's unsupported assertion that "an alleged $18 million tax subsidy … constitutes a preference" [R. 44 at 10], the Court has already explained in the context of the federal Constitution that the potential to receive back a portion of sales tax generated by AE as part of a neutral incentive program does not constitute an impermissible "preference" when AE is treated the same as the secular participants.  *See supra*.  The Commonwealth has not presented any legal authority demonstrating why this analysis should be different in the context of Section 5 of the Kentucky Constitution.

Second, Section 5 prohibits compelled attendance at "a place of worship" and at schools to which parents are conscientiously opposed.  Regardless of the nature of the Ark project, the parties do not dispute the fact that no one will be compelled to attend AiG's theme park.  On the contrary, everyone who visits there will do so voluntarily, will pay an admission fee, and can leave whenever they wish.  The prohibition against compelled attendance therefore is clearly of no concern here.

Rather, the primary issue concerning Section 5 is whether the proposed Ark Project is "a place of worship" within the meaning of the Kentucky Constitution.  Section 5 clearly prohibits compelling taxpayers to contribute to the erection or maintenance of "any place of worship" and to "the salary or support of any minister of religion."  The Commonwealth does not argue that the potential rebate would pay for a minister's salary, but it does contend that because AiG is a "religious organization with an evangelical mission," giving AiG a tax rebate would force taxpayers to contribute to its mission. [R. 24 at 17.]  The Commonwealth, however, presents no legal authority demonstrating that every religious organization with an evangelical mission, or that the Ark project in particular, is "a place of worship" within the meaning of Section 5.

The Commonwealth primarily relies on *University of Cumberlands v. Pennybacker*, which is distinguishable from the situation here.  There, the Kentucky Supreme Court invalidated state funding for a pharmacy school on the campus of a religiously affiliated university.  308 S.W.3d 668.  Interestingly, the court in *Pennybacker* did not apply Section 5 of Kentucky's Constitution when invalidating the funding at issue, but instead focused its analysis on Section 189, already addressed above.  Although the Commonwealth emphasizes *Pennybacker's* reliance on the United States Supreme Court decision *Locke v. Davey*, 540 U.S. 712 (2004), as support for its contention that state funds cannot be given to religious institutions, both these cases focus

on public funds being used to aid religious schools.[32]   308 S.W.3d at 680.  The KTDA, however, does not allocate public funds to support religious schools, and even if it did, the Commonwealth has not demonstrated that the Ark project is a religious school.

The Commonwealth does not point to any Kentucky cases specifically defining the phrase "a place of worship."  Instead, it contends that Kentucky's "no compelled contribution" provisions in Section 5 are similar to those of many other states, and requests this Court to construe them in a similar fashion as other courts in other states.  [R. 18-1 at 28-30.]  However, not only are the factual situations in those cases distinguishable from the present situation, but also the language in the constitutional provisions referenced by the Commonwealth is distinct. For example, in *Chittenden Town School Dist. v. Dep't of Ed*., the Vermont Supreme Court equated "religious instruction" with "religious worship" in the context of religious schools, but the Commonwealth does not present Kentucky law that would allow this Court to do the same, nor is the Court convinced that the Ark Project will involve religious instruction in the way the Vermont court defined it, particularly since it is not a school.  738 A.2d 539, 563 (Vt. 1999).

The Commonwealth also points to Florida's constitution which prohibits public funds being used to aid "any church, sect, or religious denomination, *or in aid of any sectarian institution*."  Fla. Const., Art. 1, §3 (emphasis added).  Notably, Section 5 of the Kentucky Constitution, however, does not include that last phrase, even though the Florida Constitution was specifically mentioned as an example during the 1890 debates on the Kentucky Constitution.[33] *Official Report of the 1890 Convention* at 850-53.  Similarly, the language of

---

[32] The Court also notes the decision in *Locke* was based upon a section of the Washington state constitution that is much broader than Kentucky's.  *See* Wash. Const. art. I, § 11 ("No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment.").

[33] Additionally, the Florida case Defendants reference emphasized that the no-aid provision in Florida's constitution did not create "a per se bar" to the state providing funds to all religious institutions, but only to government-funded

Missouri's constitution is also broader than Kentucky's, specifically prohibiting any money being taking from the public treasury "directly or indirectly, in aid of any church, sect, or denomination of religion . . . and that no preference shall be given to . . . any church, sect or creed of religion, or any form of religious faith or worship." Mo. Const. Art. 1, §7. The Washington constitutional provision at issue in *Locke* was also much broader than Kentucky's. *See* Wash. Const. Art. I, §11. Kentucky courts, however, have not defined or interpreted the language of Section 5 as including the broad meaning of these other states, and it is not the role of a federal court to interpret state law in a broader manner than the state itself has interpreted it.[34] *See Johnson v. Fankell*, 520 U.S. 911, 916 (1997).

Although the Commonwealth contests that Kentucky's anti-establishment provisions are more stringent than the federal First Amendment, the cases it cites in support of that assertion all address the context of state funding for religious schools. *See Neal v. Fiscal Ct. of Jeff. Cnty., 986 S.W.2d 907, 909-10 (Ky. 1999)*[35]; *Fiscal Ct. of Jeff. Cnty. v. Brady, 885 S.W.2d 681, 686 (Ky. 1994); Kentucky Office of Homeland Sec. v. Christerson, 371 S.W.3d 754, 760 (Ky. Ct. App. 2011)* (noting that the Kentucky Supreme Court in *Neal* and *Brady* stated that Sections 5 and 189 together "mandate a much stricter interpretation than the Federal counterpart" in the specific context of prohibiting appropriations to church schools and thus distinguishing that factual context from the dispute in *Christerson*); *see also Rudasill*, 589 S.W.2d at 884, n. 3 (noting that "Section 5 of the Kentucky Constitution is more restrictive of the power of the state

---

programs that "also advance religion," which the KTDA does not. *Council for Secular Humanism, Inc. v. McNeil*, 44 So.3d 112, 119-20 (Fla. Ct. App. 2010).

[34] Most of the cases relied upon by the Commonwealth also involve a law or appropriation granting a specific preference for a religious institution, which is not at issue here.

[35] As an aside, the Court notes that despite the application of more stringent requirements concerning Kentucky's antiestablishment provisions, the court in *Neal* upheld the benefit at issue – that of providing transportation to private and parochial schools. 986 S.W.2d at 913.

*to regulate private and parochial schools* than is the first amendment to the federal constitution")
(emphasis added).  While Kentucky courts have interpreted Section 5 in conjunction with the
constitution's provisions concerning funding for education more stringently than the federal First
Amendment in the context of state funding to religious schools, *see Christerson*, 371 S.W.3d at
760, the Court has found no legal authority suggesting that Section 5 should necessarily be
interpreted as being more stringent than the First Amendment in all other circumstances.

Thus, the Commonwealth has not presented, and the Court has not found, any legal
authority defining "a place of worship" broadly enough that it could apply to AiG or the Ark
Project based on the facts presented in the record.  The Court, however, has found some minimal
guidance on its meaning to apply in this case.  First, "Kentucky's highest court has stated that the
purpose of Section 5 of the present constitution, as well as of its predecessors, is to guarantee
religious freedom."  *Christerson*, 371 S.W.3d at 760; *see also Rawlings v. Butler*, 290 S.W.2d
801, 804 (Ky. 1956) (stating "the First Amendment of the Federal Constitution and §§ 1 and 5 of
the Kentucky Constitution guarantee religious freedom to the citizens of this Commonwealth;
while §§ 171 and 189 . . . forbid the use of money raised by taxation . . . to be used in the aid of
any church, sectarian or denominational school.").  In an early case decided not long after the
1891 Constitution was adopted, the court determined that prayer and Bible reading did not
necessarily make an institution "a place of worship" within the meaning of Section 5.  *Hackett v.
Brooksville Graded School Dist.*, 87 S.W. 792, 793 (Ky. 1905).  Although the issue in that case
again involved schools, even in the context of the stricter anti-establishment provisions
concerning funding to schools, the court emphasized that the school was "not a place of worship,
nor are its teachers ministers of religion, within the contemplation of section 5 of the
Constitution," despite the teachers' leading activities such as prayer and Bible reading.  *Id.*  The

court referenced multiple other cases from other states that made similar findings, noting that "the Bible is not a sectarian book," and that activities such as reading the Bible, praying, or singing religious songs do not transform schoolhouses into places of worship. *Id.* at 795-98. For obvious reasons, *Hackett* is not entirely on point, but it does imply that a "place of worship" is not determined solely by religious activities that take place on the property. It also states that the purpose of Kentucky's constitution was not to inhibit worship as such, but rather its "great aim" was to maintain a separation of church and state so as "to prevent government of one from assuming rightful *control* of the government of the other." *Id.* at 793 (emphasis added). From the facts presented, allowing AiG to participate in the KTDA would not violate such principles.

Second, when interpreting Kentucky's constitution, the Court must give the words used their "plain and ordinary meaning." *Freeman v. St. Andrew Orthodox Church, Inc.*, 294 S.W.3d 425, 428 (Ky. 2009) (citation omitted). In a recent case applying Section 5 of the Kentucky constitution, the Supreme Court used the word "churches" interchangeably with "a place of worship." *See Gingerich v. Commonwealth of Kentucky*, 382 S.W.3d 835, 840 (Ky. 2012). The Ark theme park certainly is not a church in the ordinary sense of the word, and AiG maintains that no religious services will be held there. The Commonwealth has not shown that this Court should interpret the phrase in a different manner than its ordinary meaning of a church or similar place used for formal religious services.

Third, there are other contexts in which the phrase "a place of worship" appears that can provide some guidance as well, such as that of entities receiving tax exemptions under Section 170 of Kentucky's constitution. Section 170 allows tax exemptions for "places actually used for religious worship," with certain attached property. § 170. In another early case, *Commonwealth v. Thomas*, 83 S.W. 572, 573 (1904), the Court interpreted "a place of worship" as used in

Section 5 in conjunction with Sections 189 and 170 as meaning "places actually used for religious worship" in the context of determining whether they qualified for tax exemptions. While acknowledging, as the Commonwealth also points out [R. 24 at 19], that a lesser tax burden for entities "devoted to the advancement of any particular religious belief is indirectly, at least a tax upon all other property owners of the commonwealth to support that belief," the court in *Thomas* specified that therefore the phrase "a place of worship" should be narrowly construed as meaning "places actually used for religious worship." 83 S.W. at 573.

Similarly, in a later case, the court again emphasized that the phrase "a place of worship" must be narrowly construed for purposes of tax exemptions under Section 170 of the Kentucky constitution, and that in doing so, the phrase "a place of worship" in Section 5 must have a similar meaning and must likewise be narrowly construed, because the prohibition against giving preferences to such places must be balanced with the tax exemptions permitted in Section 170. *City of Ashland v. Calvary Protestant Episcopal Church of Ashland*, 278 S.W.2d 708, 710 (Ky. 1955). There, the court emphasized that "use, rather than the bare fact of ownership [is] the controlling factor." *Id*. at 709. If the property at issue is to qualify for the tax exemption, "it must come within the test of being used for religious worship without regard to the fact that it is owned by a church." *Id*. Here, the Ark project is not owned by a particular church, but the Commonwealth is concerned about its connection to AiG which is clearly a religious organization with a religious mission. For purposes of tax exemptions, however, despite the religious nature of the entity that owns property, if the property is "not actually used as a place for religious worship," or "if some part of its buildings is used distinctly for other purposes," that property would be liable to taxation "without regard to its ownership." *Id*. at 711 (citation omitted). Thus, in determining whether religious property can be granted a tax exemption

despite the prohibitions of Section 5, it must be "actually used for religious worship" because the use to which it is put, rather than the entity that owns it, "is the controlling feature." *Id.* at 712.

Under this logic, the religious nature of AiG would not matter as much as the use to which the property is put.  To the Court's knowledge, the Ark project is not receiving any tax exemptions under Section 170.  On the contrary, it is paying sales tax to the state in order to qualify for the potential rebate.  AE, LLC is a for-profit organization that presumably will pay taxes.  Despite the use of one portion of the Ark for evangelistic themes such as "Christ the Door" theater, the park still qualifies as an entertainment venue under the KTDA and clearly will be used for activities other than actual religious worship, such as retail and entertainment.  Thus, for purposes of Section 170, the Ark Project likely would not qualify as "a place of worship."[36] To the extent that the same phrase should be defined in a similar manner for purposes of Section 5, the Ark project is also not a place of worship because regardless of AiG's religious purpose and affiliation, the use of the Ark Project includes retail and tourism.  Defendants do not explain how the Ark project can be "a place of worship" for purposes of Section 5 but not be "a place of worship" for purposes of Section 170.  Moreover, the phrase "is to be construed strictly" for purposes of Section 170, and in the absence of authority indicating that it should be construed more broadly for purposes of Section 5, the Court will refrain from doing so.  278 S.W.2d at 712.

Accordingly, on the facts presented and the reasoning outlined above, the Court concludes that neither AiG, nor AE, nor the Ark Project are places of worship.  AE is a for-profit limited liability company.  Although AiG is a religious organization, the parties do not suggest it

---

[36] In *City of Ashland*, the court also rejected the argument that the property at issue could be used for religious worship in the future, stating that the Constitution makes no mention of "prospective use" but only exempts property that is "actually used" for religious worship.  *Id.* at 712.  Similarly, the Court declines to engage in speculation as to how AE may prospectively use the Ark Project in the future when the characterization presented in the Hunden Report supports the conclusion that at present it is not intended as a place of worship.

is operated as a church or place where religious worship actually takes place, nor is it operated

by a particular sectarian denomination.  The Ark project is a theme park that qualifies as an

entertainment facility under the KTDA and will charge visitors an admission fee. [R. 15-21 at 5,

8.]  AiG asserts, and the Commonwealth has not shown otherwise,[37] that there will be "no

regularly scheduled religious services, no preaching, no singing of hymns or leading of prayer"

at the park [R. 36 at 47]; and even if there were, the cases cited above show that such activities

do not necessarily indicate that it is a place of worship.  According to the Hunden Report, the

project will add hundreds of new jobs, attract thousands of tourists, and have a positive economic

impact on Kentucky.  [R. 15-21 at 9-13.]  The Court has found no legal authority for expanding

the plain and ordinary meaning of "a place of worship" to include entities with such

characteristics.

Thus, under the Commonwealth's logic, the Court would need to define the phrase "a

place of worship" as used in the Kentucky constitution to include religious organizations having

a religious purpose or mission, or places where any form of evangelism takes place, or, under the

facts of this case, perhaps any place where the Christian "Gospel message" is presented.  Absent

further support for defining "a place of worship" as broadly as Defendants request, the Court

declines to take it upon itself as a federal entity to interpret a particular phrase in the Kentucky

Constitution so broadly.  It is not the role of a federal court to invent a new definition for a

phrase in a state constitution that the state's highest court has not further defined in over one

hundred years.  When defining "a place of worship" for purposes of Section 170, the Kentucky

Supreme Court noted that "[w]hen the framers of the constitution undertook to define in exact

terms what should be exempt, we are not at liberty to add to the terms which they selected with

---

[37] In fact, Defendants' own legal counsel stated that AiG had given the Cabinet adequate assurance that the project
would not "function as a church or contain a place designated for religious worship."  [R. 15-12.]

so much care and precision. . . ." *City of Ashland*, 278 S.W.2d at 712. Surely a federal court

should exercise even more caution in adding to the terms used in it.

Moreover, even if the Ark Project were a place of worship, taxpayers are not being

compelled to contribute to its erection or maintenance. Any rebate received under the KTDA is

based "on the sales generated by or arising at the tourism development project." Ky. Rev. Stat.

§ 139.536(2)(a). Therefore, if AE receives a rebate, the amount will be funded by the sales taxes

paid by visitors who choose to come to the Ark project. If no one chooses to come and pay the

sales tax, then AE will not receive any incentives. § 148.835(3)(b)1.b. Even then, AE will only

receive a rebate if "the amount by which increased tax revenues from the Project will exceed the

incentives given to the approved Company at the maximum level of recovery of approved costs

as provided in KRS 148.853." § 148.855(4)(c)(1). The nature of this benefit, therefore, is not

the same as a direct subsidy or as designating certain funds for the support of a certain entity.

Despite the Commonwealth's contention that the rebate comes from public funds because the

sales taxes are "comingled" with other public funds, because the incentives are funded entirely

by the sales tax paid by voluntary visitors to the Ark – a tax they would pay anyway – any rebate

will not "compel" anyone to support AiG and will not increase the tax burden on other

taxpayers.[38] [*See* R. 38-1.] This situation is therefore more analogous to a tax exemption in the

sense that when the government "declines to impose a tax, its budget does not necessarily suffer.

On the contrary, the purpose of many government expenditures and tax benefits is to spur

economic activity, which in turn *increases* government revenues." *Arizona Christian Sch.

Tuition Org. v. Winn*, 563 U.S. 125, 136 (2011) (citation and internal quotation marks omitted).

---

[38] Additionally, giving the rebate to any program applicant does not deprive the general coffers of money that could in theory be used for other purposes because under the KTD Act, the program participants enter into a binding agreement with the tourism department guaranteeing the terms of the rebates. *See* Ky. Rev. Stat. § 148.859.

The history and intent of Kentucky's antiestablishment provisions also do not support the conclusion that they apply to this situation. After searching at length through the record of proceedings of the 1890 Constitutional Convention, the Court is not aware of any place that the drafters defined the phrase "place of worship" more specifically in the context of Section 5, or as broadly as Defendants wish this Court to define it here. In other contexts, such as discussions concerning tax exemptions, the drafters repeatedly used the phrase interchangeably with churches and even with mosques, while also distinguishing "places of worship" from property of religious denominations not actually used for purposes of worship. *See, e.g., Official Report of the 1890 Convention* at 2387, 2391, 2506, 2511, 2525. The implication therefore is that places of worship were not considered to be simply any property having a religious affiliation or purpose.[39] Moreover, the discussions during the 1890 Debates about Kentucky's Bill of Rights reflect an overarching concern with protecting freedom of conscience with regard to worship and with protecting civil liberties of individuals regardless of religious belief rather than an intent to remove every connection between government and religion. *See, e.g.*, *Official Report of the 1890 Convention* at 849-58 (discussing changes to current section 5 in order to protect individual liberty), 1059-86 (discussing removal of restrictions against ministers from holding public office), 1756-57 (discussing importance of individual liberty), 2386 (emphasizing important role of religion), 2535 (wanting to ensure that no legislature can interfere with the right of worshiping God according to dictates of one's own conscience).

If anything, the drafters of the 1890 constitution arguably made the language used in Section 5 less broad than it had been in previous constitutions. Kentucky's constitutions of

---

[39] In fact some of the delegates noted that "place of worship" in the context of tax exemptions could not be so broad as to mean any place where religious activities took place because people could obviously pray and worship in their homes or fields and yet still have to pay property taxes on them. *Official Report of the 1890 Convention* at 2509-10, 2525, 2532.

1792, 1799, and 1850, each contained identical sections providing for religious liberty.  *See*

*Rudasill*, 589 S.W.2d at 879-80.  That earlier language read in relevant part as follows:

> That all men have a natural and indefeasible right to worship Almighty God according
> to the dictates of their own consciences; that no man can of right be compelled to
> attend, erect, or support any place of worship, *or to maintain any ministry against his*
> *consent* . . . .

Ky. Const. 1792, Art. XII, Sections 3-4 (emphasis added); Ky. Const. 1799, Art. X, Sections 3-4

(emphasis added); Ky. Const. 1850, Sections 5-6 (emphasis added).  Thus, the phrase "or to

maintain any ministry against his consent" was removed from the present version, indicating an

intent to make the language less broad.[40]

Finally, despite asserting that Kentucky's antiestablishment provisions must be read in

context [R. 44 at 9], the Commonwealth seemingly ignores the second half of Section 5 which,

when considered in conjunction with the first half, presents a balanced approach that also

protects individuals from state infringement on the free exercise of religion.  As with the federal

constitution, antiestablishment concerns must not become so prominent that the state violates

individuals' religious freedom in the process.  The Commonwealth nowhere addresses how the

second half of Section 5 relates to their concerns over the first half in the present situation.

Kentucky's Supreme Court, however, recently noted the following: "We have held, with regard

to [sections 1 and 5 of the Kentucky Constitution], that our state constitution offers no more

protection than the same or similar section of the federal constitution," and therefore "our

jurisprudence is linked to the Supreme Court's interpretation of the First Amendment."  *Kirby v.*

*Lexington Theological Seminary*, 426 S.W.3d 597, 618, n. 78 (Ky. 2014) (quoting *Gingerich v.*

*Commonwealth*, 382 S.W.3d 835, 839 (Ky. 2012)).  Accordingly, the Court refers back to its

analysis explained above concerning the federal Free Exercise Clause, and absent authority

---

[40] Even had that phrase been retained, however, as explained above, Kentucky residents are not being compelled to
maintain AiG's ministry against their consent, given the nature of the rebate.

indicating that Section 5 of Kentucky's constitution should be interpreted differently, finds that AIG's exclusion from participation in the KTDA arguably violates the prohibition in the second half of Section 5 against diminishing rights, privileges, or capacities of an individual because of their beliefs in any religious tenet, dogma, or teaching.

In conclusion, even if Kentucky's constitutional provisions relied upon by the Commonwealth were applicable to this case, while states may have more stringent protections in their constitutions, they cannot violate individual rights that are protected in the federal Constitution.  *See, e.g., McDaniel v. Paty*, 435 U.S. 618, 628-29 (1978) (striking down Tennessee constitutional provision as violating the federal Free Exercise Clause despite the state's assertion that the provision served antiestablishment interests); *Torcaso v. Watkins*, 367 U.S. 488, 492-95 (1961) (striking down Maryland's constitutional requirement for holding public office without evaluating the state's alleged interests because it violated the federal Free Exercise Clause).  The federal Constitution may only be a floor and not a ceiling, but it is a floor nonetheless.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church of the Lukumi*, 508 U.S. at 532.  As explained above, AiG's exclusion from the KTDA program on the basis of its religious beliefs, message, and conduct in hiring violates the freedoms protected by the federal Free Exercise Clause, and also violates the federal Establishment Clause through impermissible entanglement with religion.  Accordingly, Kentucky's constitutional provisions could not transform such violations into permissible action.

**D**

The Commonwealth also argues that AiG's claims against Secretary Stewart in his individual capacity for nominal damages should be dismissed because he enjoys qualified immunity.[41]  [R. 18-1 at 45-47.]  Government officials are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  As long as there is a "legitimate question" about the constitutionality of particular conduct, "it cannot be said that ... such conduct violates clearly established law." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).  Here, because the Court has determined that a constitutional violation has taken place, the question is whether the law was clearly established at the time of the alleged conduct such that Secretary Stewart would be on notice that his exclusion of AE from the KTDA program was unconstitutional.  *Pearson,* 555 U.S. at 244.

While the Court finds the law reasonably clear in this matter, given the facts leading up to AiG's decision to file suit, the length of the briefing and oral arguments, and the necessary detail of the Court's analysis thus far, it is difficult to say that Secretary Stewart would have been clearly on notice that his actions were unconstitutional.  Even if the law is clearly established, the plaintiff must offer sufficient evidence that the official's conduct was objectively unreasonable in light of the clearly established right.  *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. . . .  This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal citations and

---

[41] Because Plaintiffs dropped their state law claims, the Court need not address the parties' arguments concerning the application of the Eleventh Amendment.

quotation marks omitted); *see also Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir.

2014) (quoting the same).  Courts should be wary of defining clearly established law "at a high

level of generality since doing so avoids the crucial question whether the officer acted reasonably

in the particular circumstances that [he] faced."  *Occupy Nashville*, 769 F.3d at 443.  Here,

although a constitutional violation occurred, AiG has not offered sufficient evidence to

demonstrate that Secretary Stewart knowingly violated their clearly established right.  *See*

*Sample v. Bailey*, 409 F.3d 689, 695–96 (6th Cir. 2005).  Accordingly, the claims against

Secretary Stewart in his individual capacity will be DISMISSED.

### III

Whether AiG meets the criteria in the KTDA is not the question before the Court.  The

Court finds that the Commonwealth's exclusion of AiG from participating in the program for the

reasons stated – i.e., on the basis of AiG's religious beliefs, purpose, mission, message, or

conduct, is a violation of AiG's rights under the First Amendment to the federal Constitution.

Because, as explained above, AiG has shown a substantial likelihood of success on the merits of

their federal First Amendment claims, the Kentucky Constitution cannot bar those claims.

Additionally, the provisions in the Kentucky constitution cited by the Commonwealth are

inapplicable to the case at hand.  When balancing this finding against the other necessary factors,

the Court concludes that a preliminary injunction is warranted.[42]  Accordingly, and the Court

being sufficiently advised, it is hereby ORDERED as follows:

---

[42] Because Plaintiffs are likely to succeed on the merits of their First Amendment claims, which is the determinative
factor for granting a preliminary injunction in this context, the Court need not extensively address the other factors
for injunctive relief.  *See Jones*, 569 F.3d at 265-66; *Congregation Lubavitch*, 923 F.2d at 460; *see also Newsom v.
Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (finding that "even minimal infringement upon First Amendment values
constitutes irreparable injury sufficient to justify injunctive relief"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("the
loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury.").

1.      Defendants' Motion to Dismiss Plaintiffs' claims under Rule 12(b)(6) [**R. 18**] is **DENIED as to all claims except those against Secretary Stewart in his individual capacity**;

2.      Plaintiffs' claims against Secretary Stewart in his individual capacity are **DISMISSED**;

3.      Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE to their being pursued in state court**, pursuant to Plaintiffs' withdrawal of those claims [R. 36 at 22]; and

4.      Plaintiffs' Motion for Preliminary Injunction [**R. 15**] is **GRANTED in PART as follows:** The Commonwealth of Kentucky and its Tourism, Arts, and Heritage Cabinet are enjoined from applying the KTD Act in a way that excludes AE, LLC from the program based on its religious purpose and message or based on its desire to utilize any Title VII exception for which it qualifies concerning the hiring of its personnel.

This the 25th day of January, 2016.

Gregory F. Van Tatenhove
United States District Judge